## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

In re:                                           Case No. 6:10-bk-00584-KSJ

**SHERWOOD INVESTMENTS**                          **CHAPTER 11**
**OVERSEAS LIMITED, INC.,**

       **Debtor.**

_____/

**SHERWOOD INVESTMENTS**
**OVERSEAS LIMITED, INC.,**

       **Plaintiff,**                          Adv. Pro. No.  10-00158-KSJ

**vs.**

**THE ROYAL BANK OF SCOTLAND N.V.,**
**f/k/a ABN AMRO BANK N.V.,**

       **Defendant.**

_____/

### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
### TO DEFENDANT'S MOTION TO EXCLUDE EXPERT OPINIONS OF
### CONNER & SUSSMAN UNDER *DAUBERT* AND FEDERAL RULE OF EVIDENCE 702

Plaintiff, **SHERWOOD INVESTMENTS OVERSEAS LIMITED, INC.** ("Sherwood"), by and through its undersigned counsel, hereby responds in opposition to the Motion to Exclude Expert Opinions of Conner & Sussman Under *Daubert* and Federal Rule of Evidence 702 (Adv. Doc. No. 210) (the "Motion"), by Defendant, **THE ROYAL BANK OF SCOTLAND N.V., f/k/a ABN AMRO BANK N.V.** ("RBS"), as follows:

### INTRODUCTION

In the Motion, RBS seeks to exclude Sherwood's expert witnesses, Robert E. Conner ("Conner") and Richard J. Sussman ("Sussman"), of Thornapple Associates, Inc.

("Thornapple"), "from offering expert opinions on (a) the investment practices of the parties, and (b) Plaintiff's alleged damages in this case."  Motion at p. 1.[1]  As set forth herein, the contentions raised by RBS in the Motion are without merit and, at best, raise issues which are properly left to the jury and the normal adversary process.  Accordingly, the Motion must be denied.

## ARGUMENT

### I.   Federal Rule Evidence 702 and the Daubert Standard.

Federal Rule of Evidence 702 ("Rule 702"), which governs the admissibility of expert testimony, provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)    the testimony is based on sufficient facts or data;
>
> (c)    the testimony is the product of reliable principles and methods; and
>
> (d)    the expert has reliably applied the principles and methods to the facts of the case.

In determining admissibility under Rule 702, a court engages in a three-part inquiry:  (1) whether the expert is qualified to testify competently; (2) whether the expert's methodology is sufficiently reliable; and (3) whether the expert's testimony assists the trier of fact.  See, e.g., Quiet Technology DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1340-41 (11th Cir. 2003).  Factors which a court may consider in determining the reliability of an expert's opinion include "(1) whether the expert's theory can be and has been tested; (2) whether the theory has

---

[1] The Expert Report of Robert E. Conner & Richard J. Sussman (Adv. Doc. No. 210-1) is referred to herein as the "Expert Report."

been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." <u>Id.</u> at 1341 (listing factors discussed in <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993)). "Notably, however, these factors do not exhaust the universe of consideration that may bear on the reliability of a given expert opinion, and a federal court should consider any additional factors that may advance its Rule 702 analysis." <u>Id.</u> In performing its gatekeeping function under Rule 702, "a trial court <u>may</u> consider one or more of the more specific factors that <u>Daubert</u> mentioned when doing so will help determine that testimony's reliability." <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 142 (1999). As stated in <u>Daubert</u>, the court's inquiry under Rule 702 is "a flexible one" and "[t]he focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." <u>Daubert</u>, 509 U.S. at 594-95.

Moreover, "[a] district court's gatekeeper role under <u>Daubert</u> is not intended to supplant the adversary system or the role of the jury." <u>Maiz v. Virani</u>, 253 F.3d 641, 666 (11th Cir. 2001) (internal quotation marks and citation omitted). Instead, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." <u>Daubert</u>, 509 U.S. at 596. Further, "it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." <u>Quiet Technology DC-8, Inc.</u>, 326 F.3d at 1341.

With these principles in mind, the Motion is without merit and must be denied. The purported issues raised in the Motion are properly the subject of cross-examination and presentation of contrary evidence to the jury, whose job it is to determine the persuasiveness of

the expert testimony.   Simply put, the matters raised in the Motion go to the weight of the evidence and not to admissibility.

## II.   The Damages Suffered by Sherwood Are Properly Measured by Lost Future Profits, Not by the Market Value of the Business.

RBS first argues that the expert opinions offered by Conner and Sussman are not reliable or helpful because the proper method of damages "is based solely upon the market value of Sherwood's business at the time it ceased operations."   Motion at p. 5 (emphasis removed). However, contrary to RBS's argument, Sherwood's business was not "completely destroyed," and therefore Sherwood's damages are properly measured using a lost profits analysis, as discussed in Sherwood's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment (the "Summary Judgment Opposition") at Section III.A.4.a., which is incorporated herein by reference.   Accordingly, RBS's contention that Sherwood's damages should be based on a market value is without merit and does not serve as a basis for excluding Conner and Sussman's expert opinions regarding lost profits.

RBS next argues that Conner and Sussman's opinions should be excluded because they "are not qualified to give an expert opinion on the market value of Sherwood."   Motion at p. 11. This argument is based on RBS's faulty contention that the proper measure of damages in this action is market value rather than lost profits.

RBS makes no attempt to argue that Conner and Sussman are not qualified to perform a lost profit analysis in this action, and any such attempt would be fruitless.   Pursuant to Rule 702, a witness may be "qualified as an expert by knowledge, skill, experience, training, or education." The Expert Report details the knowledge, skill, experience, training, and education that Conner and Sussman possess which qualify them to render the opinions set forth therein.   Their qualifications are based on their advanced degrees in business, their extensive experience

working in the securities industry, and their knowledge of the standards and practices of the security industry.  See Expert Report at pp. 1-4 and Exhibit A.  In particular, Conner and Sussman are qualified to provide expert opinions based on their extensive experience as actual participants in the market and not merely observers of the market.  For example, Sussman testified that he relied on his own experience on Wall Street for his expert opinions, stating that

> from 2000 to 2009, I was in charge of global risk management for the global securities services department of Goldman Sachs. Goldman Sachs and Morgan Stanley were the two largest prime brokers, the two largest providers of services to hedge funds at the time.  . . .  [I]t was believed that those two firms controlled more than 50 percent of all prime brokerage assets.
>
> Given that hedge fund assets in 2008 were estimated anywhere from two trillion to two and a half trillion, you see the numbers were pretty large.  So it was on the basis of the experience that I have . . . .

Transcript of June 4, 2014 Deposition of Richard Sussman ("Sussman Dep.") (Doc. No. 208-37) at 153-54.

Similarly, in explaining one of the assumptions underlying his opinions, Sussman stated that

> this is what we used on the trading desk; that if we had risk to a VWAP, if we somehow had exposure where we would have to try to match a VWAP and to the extent that we could not trade as well as VWAP, we would actually lose money, we could assume that we could trade up to 20 percent of the volume each day and still basically match the VWAP price.

Sussman Dep. at 166.

Accordingly, Conner and Sussman are eminently qualified to testify as experts as to the lost profits opinions expressed in their Expert Report.

**III.**   **Conner and Sussman's Expert Opinions Are Sufficiently Reliable.**

    **A.**   **The Assumptions Underlying Conner and Sussman's Opinions Have a Sufficient Foundation.**

RBS contends that "the ultimate predictions of Thornapple as to Sherwood's supposed lost future profits relies upon untenable assumptions, and ignores obvious risks that render the opinions too speculative," and that "[t]he assumptions employed are nothing more than Benscher's wishful thinking about what Sherwood "would have done," but-for RBS N.V.'s conduct."  Motion at p. 15.  This argument fails because Conner and Sussman's expert opinions are not based on "untenable assumptions" or mere speculation and conjecture.  The Expert Report and the deposition testimony of Conner and Sussman demonstrate the foundation for the assumptions that Conner and Sussman utilized in their lost profits analysis, as set forth in Section III.A.4.b. of the Summary Judgment Opposition, which is incorporated herein by reference. Moreover, RBS's arguments about the foundation of Conner and Sussman's opinions are issues more appropriately addressed at trial.

Contrary to RBS's contentions, Connor and Sussman did not base their opinions on Benscher's mere speculation about what he "would have done."  Motion at p. 17.  As noted, both the Expert Report and the deposition testimony of Conner and Sussman detail the bases for the assumptions made by Conner and Sussman.  The Expert Report states that Conner and Sussman "used assumptions provided by Benscher, and further evidenced by existing and previously agreed upon Certificate capacities, historical trading ranges, published PR letters and investor call transcripts, as to how he would have most likely dynamically traded the portfolio over the period from September 17, 2008 through December 31, 2013."  Expert Report at pp. 45-46 (footnote omitted).

Conner and Sussman further explained the foundations for their assumptions in their depositions.  For example, Sussman testified that "I made it clear to Mr. Bencher that the assumptions had to be something which came from him but were consistent with how he has traded in the past and consistent with how he would explain how he might have been able to trade going forward."  Sussman Dep. at 137.  Similarly, Conner testified as follows:

> We're not simply adopting as a vouchsafe anything that Mr. Benscher says.  The assumptions that we embrace in the report are the product, in the first place, of a conclusion on our part, mine and Mr. Sussman's, that this is an event-driven strategy and that the approach to damages ultimately is a market-adjusted damage measure, and that the components of that damage measure fall into two categories.
>
> The first category is based on positions that existed at the time things started to go wrong.  The second category is how you would approach the market-adjusted measure once you're no longer dealing with those positions.  The assumptions as to how to treat the existing positions were based on very detailed questioning of Mr. Benscher on each company in which he had investment exposure.
>
> . . . [Benscher's] an activist investor, so that there's a reason he's involved in certain companies and there are certain events that are driving the degree and timing of his actions.
>
> So the predicate is, once we were satisfied that there's a consistency in the approach, which was also drawn by reference to objective sources that have nothing to do with Mr. Benscher.

Transcript of June 5, 2014 Deposition of Robert E. Conner ("Conner Dep.") (Doc. No. 208-39) at 53-54.

Both the Expert Report and deposition testimony of Conner and Sussman demonstrate that Conner and Sussman were not simply relying on after-the-fact assertions of what Benscher "would have done" without any foundation or support.  Conner and Sussman relied not on mere speculations but on "the interactive conversation with Mr. Benscher about how he would have traded in these names in a way that would have been consistent with how he had traded in the

past and consistent with what was happening with these names during this time period."

Sussman Dep. at 260.  For example, in discussing the foundations for their assumptions and

opinions, Sussman testified as follows:

> [Benscher's] done business in the name before.  So it's not just picking a new name at random, let's find a stock that would have done really well in 2009.  There's a name they would have had familiarity with.  There's a name they would have had some trading with RBS.  It was picking a side that he had done business with RBS previously in and, therefore, I would have worked with him on the assumptions as to how -- when he would have gotten in, when he would have lightened up and why he would have sold some of his positions and what would have caused him to hold onto it.  And we were going over that with each of the names, what would have caused him to go into a name, what would cause him to change his mind going forward.

Sussman Dep. at 138.

Similarly, Sussman explained that

> [i]n other cases, [Benscher] would talk about how he was involved with the company, in discussions with the company and his idea was if something went down, to increase exposure and to be able to facilitate some kind of event at the company to create value. And when that event would happen, he would then look to reduce his position.

Sussman Dep. at 158.

Conner and Sussman did not merely rely on the statements made by Benscher.  Rather,

they pressed him for the reasons and logic underlying those statements:

> [W]e wanted Mr. Benscher to be able to describe for us what his trading strategy would have been in a way that we thought was consistent with how he had traded in the past and how he might have traded given these events.
>
> . . .
>
> [W]e relied on his statement and we would press him as to the logic that would underlie that statement.  So it couldn't just be well, the stock was going to go down the next day, I would have

> known, then I would have sold it.  There had to be some
> explanation that we thought was going to -- to make some sense.
>
> . . .
>
> All these stocks were stocks that Mr. Benscher was very familiar
> with and he knew the management.  In many cases he had specific
> ideas for what management could do to try to increase the value.
> So he felt that he had a pretty good sense for what the underlying
> value was.
>
> . . .
>
> Directionally, I just wanted to make sure that what he was saying
> had some basis based on how he had been trading and based on
> what was going on in the market.

Sussman Dep. at 266-70.

> Likewise, Conner testified as follows:

> So that the premise of that is that [Benscher] will make a decision
> at some point that either the reason he was invested in this
> particular security turned out to materialize or it turned out that it
> definitely won't or there's some other reason he's decided to adjust
> the size of his position. . . .
>
> So there you're -- you're walking through the event specific to
> stocks he's already chosen.  . . .

Conner Dep. at 205.

Moreover, in discussing their damages calculations, Conner and Sussman state that "[a]ssumptions and damages . . . assume Benscher's best estimation of trading activity he was likely to have undertaken in the names in which Sherwood either had a position as of September 17, 2008 or had had a position in the past and was still actively engaged in."  Expert Report at p. 46.  Thus, Conner and Sussman's assumptions are based, not on mere guesses, but on actual positions held by Sherwood or in which Sherwood had active engagements.

In reaching their opinions, experts "are entitled to state reasonable assumptions." Southeastern Metals Manufacturing Co., Inc. v. Florida Metal Products, Inc., 778 F. Supp. 2d

1341, 1344 (M.D. Fla. 2011).  "Any weaknesses in the underpinnings of the expert's opinion go to its weight rather than its admissibility."  Id.  A factual dispute regarding an expert's assumptions "is better resolved through vigorous cross examination and presentment of contrary evidence at trial.  The Eleventh Circuit has made clear that a Daubert motion is not intended to [supplant] the adversary system."  Id.  The appropriate course of action is for RBS to challenge any perceived weaknesses in the assumptions made by Conner and Sussman by presenting contrary evidence at trial and not through a Daubert motion.

Additionally, utilizing facts provided by a party is not in and of itself a basis for excluding expert testimony.  See Marshall Auto Painting & Collision, Inc. v. Westco Engineering, Inc., Case No. 6:02-cv-109-Orl-22KRS, 2003 WL 25668018 (M.D. Fla. May 8, 2003).  In Marshall Auto Painting & Collison, Inc., the defendant argued that the plaintiff's expert's "report and related testimony should be stricken because they are largely based on the statements of Mr. Hartung or persons closely related to Mr. Hartung without any independent confirmation."  Id. at *5.  Chief Judge Conway rejected the defendant's argument, stating that the expert had consulted numerous documents and performed other observations and that the report reflected that the expert's opinions were based largely on those observations and not merely on Mr. Hartung's assurances.  Id.  Likewise, here, Conner and Sussman's opinions are not based solely on Benscher's assurances.  Rather, as discussed above, Conner and Sussman undertook efforts to validate Benscher's statements before relying on them in their report.

The situation present in this action, where the assumptions are grounded in sufficient known facts about the event-driven investment strategy utilized by Sherwood, as well as known facts about what actually happened in the market, is distinguished from the cases upon which RBS relies.  In the cases cited by RBS, unlike the case here, the plaintiff's expert did not rely on

sufficiently known facts.  See McMahan Securities Co. L.P. v. FB Foods, Inc., Case No. 8:04-cv-1791-T-24TGW, 2007 WL 704916 (M.D. Fla. Mar. 2, 2007) (expert's methodology was unreliable where experts relied on early business plan prepared to attract investors and failed to take into account subsequent events which actually occurred or a later business plan which projected a significant decline in sales); Lipscher v. LRP Publications, Inc., 266 F.3d 1305 (11th Cir. 2001) (evidence of lost profits was insufficient to create genuine issue of material fact where plaintiff relied solely on generalizations and not evidence of historical income or expenses); Sun Ins. Marketing Network, Inc. v. AIG Life Ins. Co., 254 F. Supp. 2d 1239 (M.D. Fla. 2003) (expert's opinion on lost profits was not reliable where hindsight demonstrated that the company had ceased sales and therefore opinion was not grounded on known facts); Fidelity Warranty Services, Inc. v. Firstate Holdings, Inc., 74 So. 3d 506 (Fla. 4th DCA 2011) (expert's opinion was too speculative where opinion was based on projection of lost profits five years into the future but the defendant had a right to terminate the contract for any reason with ninety days' notice); Brough v. Imperial Sterling, Ltd., 297 F.3d 1172 (11th Cir. 2002) (award of damages based on future commissions for sale of property was too speculative where it was unclear at the time of trial whether defendant would have proceeded with a sale of the property before plaintiff's contract expired); Fla. Sunrise, Ltd. v. Tri-M Investments of South Florida, Inc., 942 So. 2d 421 (Fla. 4th DCA 2006) (evidence of lost profits based on expansion of virtual office spaces was too speculative where witness testified that he merely suggested an expansion and claimed it would have been profitable with no supporting evidence).

Similarly, the investment strategy employed by Sherwood can be distinguished from the investments at issue in the cases cited by RBS.  In Kane v. Shearson Lehman Hutton, Inc., 916 F.2d 643 (11th Cir. 1990), the investor did not provide any evidence of any investment strategy

that he would have followed; rather, he was merely relying upon the advice of his broker and claimed that "he would have sold the securities at the optimal time absent [the broker's] misrepresentations." Id. at 647.  Here, on the other hand, Sherwood had an investment strategy based on research and familiarity with the companies, and Sherwood is relying on its established practices in determining when to buy and sell.

In Messer v. E.F. Hutton & Co., 833 F.2d 909 (11th Cir. 1987), the proof of damages "was premised on Messer's following an investment plan devised by his broker at E.F. Hutton." Id. at 922.  The problem was that Messer had no track record for following such a plan, and the Eleventh Circuit found that "there is little reason to believe that Messer would have followed E.F. Hutton's investment plan." Id. at 923.  In fact, Messer's trading pattern "was completely opposite the buy and hold pattern outlined in the plan." Id.  Unlike the situation in Messer, the assumptions used in Conner and Sussman's damage calculations are fully consistent with Sherwood's prior trading practices and its long-term investment strategy.

In Resolution Trust Corp. v. Stroock & Stroock & Lavan, 853 F. Supp. 1422 (S.D. Fla. 1994), the court found that the record was "simply devoid of any evidence to show -- much less, create 'reasonable certainty' -- that COMMONWEALTH would have bought BBB bonds (or any other single investment) but for the alleged negligence of the defendants." Id. at 1425-26.  The court emphasized the fact that the "alternative investment choice" that was the foundation of the alleged damages was "not known" to Commonwealth. Id. at 1426.  Again, by contrast, the assumptions used by Conner and Sussman were based on Certificates that were not just "known," but which had been previously created and/or used by Sherwood with respect to select companies that were central to Sherwood's established long-term investment strategy.

In Himes v. Brown & Company Securities Corp., 518 So. 2d 937 (Fla. 3d DCA 1988), Himes claimed that "had Brown correctly completed his requested transactions, he would have then sold the Eastern warrants at closing on the same day that he purchased them and completed the short sale nine months later, thereby earning a profit on both transactions." Id. at 938-39. However, Himes offered no evidence "that he would have completed the time-sensitive transactions at precisely the correct time." Id. at 939.  Likewise, in Merit Ins. Co. v. Colao, Case No. 75 C 899, 1989 WL 917 (N.D. Ill. Jan. 3, 1989), there was no evidence of how the surplus funds at issue would have been invested.  On the contrary, Sherwood's approach is based on an investment strategy, historical trading practices, and familiarity with the companies in which it had invested.

In Three Crown Limited Partnership v. Saloman Bros., Inc., 906 F. Supp. 876 (S.D.N.Y. 1995), the Court rejected Three Crown's effort "to recover profits from investments it never made on securities it never purchased or sold, based on the theory that as a consequence of Defendants' manipulation of the market, Three Crown was not able to engage in those unnegotiated and unconsummated trades." Id. at 884.  In short, Three Crown improperly sought damages based on "trades never negotiated or positions never held." Id. at 886.  By contrast, Sherwood's lost profits are premised on Certificates that were previously created and/or used with respect to companies that were part of Sherwood's overall investment strategy.

Finally, in Emerald Investments Ltd. Partnership v. Allmerica Financial Life Ins. and Annuity Co., 516 F.3d 612 (7th Cir. 2008), Emerald "engage[d] in international time-zone arbitrage." Id. at 615.  Because Emerald's profits were based on trading on the difference between opening and closing prices in different time zones, "[o]nce the price of shares, traded on a foreign stock exchange, at the opening of the New York Stock Exchange is known, one knows

with certainty whether buying shares in a mutual fund that owned those foreign-traded shares at 3:59 p.m. New York time the previous day would have been profitable.  That is no evidence that one would have traded then, for there is no way in which such testimony could be tested."  Id. at 618.  The court noted that "[i]t would be different had Emerald based its market-timing trading on a formula that determined when and in what dollar amount to transfer money into the Scudder International Fund and when to transfer back out of it into the money-market fund.  But it did not use a formula.  It traded on hunch."  Id.  Sherwood, on the other hand, did not trade on a "hunch" and instead traded based on its previously established long-term investment strategy.  Moreover, Sherwood's strategy was not based on market timing but rather on the occurrence of anticipated future events.

RBS also complains that "Sherwood had no documented trading strategy or blueprint, but was instead guided by Benscher's research and personal investment taste," and that Conner and Sussman failed to review Sherwood's financial condition and historical performance and trading practices.  Motion at p. 20.  However, as discussed above, these contentions are untrue and, in any event, such arguments go to the weight of the evidence and not admissibility.  "On cross-examination, the opposing counsel is given the opportunity to ferret out the opinion's weaknesses to ensure the jury properly evaluates the testimony's weight and credibility.  . . . [A]s long as a logical basis exists for an expert's opinion and the inadequacies are fully disclosed to the jury, the weaknesses in the underpinnings of the opinion, go to the weight and not the admissibility of the testimony."  Jones v. Otis Elevator Co., 861 F.2d 655, 663 (11th Cir. 1988); see also Rosenfield v. Oceania Cruises, Inc., 654 F.3d 1190, 1194 (11th Cir. 2011) (stating that arguments that the expert's methods failed to accurately test certain conditions and that conclusions were based on incorrect assumptions "attack the weight and the persuasiveness of

[the expert's] testimony, not its admissibility"); <u>Marshall Auto Painting & Collision, Inc.</u>, 2003 WL 25668018, at *7 (stating that, to the extent that the expert "improperly included certain elements into his calculation of lost profits while disregarding other factors . . . the most appropriate response is to allow the Defendant to vigorously cross-examine [the expert] in that regard").

Because Conner and Sussman's expert opinions are not based on mere speculation, but instead have a proper foundation, the Motion must be denied.

### B. <u>Daubert</u> and Its Progeny Do Not Require Expert Opinions to Be "Tested" in Order to Be Admissible.

RBS argues that "there is simply no way to test" Conner and Sussman's damages opinions and that the "calculations are impossible to meaningfully or reliably verify." Motion at p. 23 (emphasis removed). RBS ignores the fact that its own experts extensively tested and critiqued Thornapple's opinions in their own 99-page expert report (Doc. Nos. 208-44 & 208-45). In any event, there is no requirement under <u>Daubert</u> that an opinion be formally "tested" in order to be admissible. Indeed, <u>Daubert</u> states that "[t]he inquiry envisioned by Rule 702 is, we emphasize, a flexible one." <u>Daubert</u>, 509 U.S. at 594. Moreover, the United States Supreme Court has clarified that "<u>Daubert's</u> list of specific factors <u>neither necessarily nor exclusively applies to all experts or in every case</u>." <u>Kuhmo Tire Co.</u>, 526 U.S. at 141 (emphasis supplied). "<u>Daubert</u> makes clear that the factors it mentions do <u>not</u> constitute a 'definitive checklist or test.'" <u>Id.</u> at 150.

In <u>Thomas v. Bombardier Recreational Products, Inc.</u>, Case No. 2:07-cv-730-FtM-29SPC, 2010 WL 4188308 (M.D. Fla. Oct. 20, 2010), the parties sought to exclude expert testimony on the grounds that the expert did not perform any testing. The court stated that the parties were "incorrect in arguing that an expert cannot be allowed to testify without testing. An

15

expert may testify to an opinion which is based on experience, training, or education, and not upon the scientific method, if the Court finds the opinion sufficiently reliable." Id. at *6. Moreover, an argument based on whether an expert has not engaged in testing goes to the weight and sufficiency of the evidence, not to its admissibility. See Maiz, 253 F.3d at 669. In Maiz, the Eleventh Circuit stated that "there is no question that an expert may still properly base his testimony on 'professional study or personal experience' and that any objections "go to the weight and sufficiency of [the expert's] opinions rather than to their admissibility." Id. Thus, RBS's argument regarding testing is unfounded.

### C.   Conner and Sussman's Expert Report Provides an Acceptable Range of Damages.

RBS further argues that Conner and Sussman's damages calculations are speculative because it contains "four (4) extremely divergent damage calculations." Motion at p. 24. However, Conner and Sussman's report does not contain a "range" of damages calculated under one scenario; rather, Conner and Sussman calculated four different damages figures based on four different scenarios. The Expert Report explains the four damages calculations contained in the report:

> Benscher was not just an active investor but he was an activist investor. He developed personal relationships with senior management and worked on various strategies with outside investors to create and capture value. . . . On top of this, he would consistently utilize leverage. We calculated four different damage numbers. In the first calculation, we assume that all positions listed in Exhibit 62 to Freeman's Deposition would have been maintained until an event occurred. When an event occurred, such as an acquisition or a special dividend, or when it was clear that an event would not occur, we adopted as an assumption of fact, based on input from Benscher, that the position would be liquidated and that proceeds would be reinvested. . . . It should be emphasized that, given Sherwood's history of active trading, we consider it highly unlikely that no further changes would have been made to the portfolio that existed on September 17, 2008, making a static portfolio a less representative basis for applying a damage methodology to Sherwood's decidedly event driven strategy.

The second calculation is the same as the first with the crucial difference that it was assumed that any proceeds from the liquidation of [a] single Certificates [sic] would have been reinvested in the Russell 2000 Index with the use of three dollars of borrowed money for every dollar invested. This assumption followed the reasoning that all positions sold by Sherwood through RBS were leveraged at least 4-to-1. Consequently, leveraging a stock index more closely follows form than leaving funds idle and unleveraged. . . .

For the third set of calculations, we used assumptions provided by Benscher, and further evidenced by existing and previously agreed upon Certificate capacities, historical trading ranges, published PR33 letters and investor conference call transcripts, as to how he would have most likely dynamically traded the portfolio over the period from September 17, 2008 through December 31, 2013. Assumptions and damages . . . assume Benscher's best estimation of trading activity he was likely to have undertaken in the names in which Sherwood either had a position as of September 17, 2008 or had had a position in the past and was still actively engaged in. It is assumed that upon the realization of an event, that proceeds would have been reinvested in the Russell 2000 without the use of leverage. . . .

For the fourth set of calculations, we used the same set of trading assumptions used in the calculations in the preceding paragraph, but with the realized funds leveraged on the same 4-to-1 basis as in the second calculation.

Expert Report at p. 44-46.

These calculations fall within two main scenarios referred to the "Static Portfolio" and the "Trading Portfolio, and they are provided in the alternative, with and without the leverage component of trading, in Exhibits "C" through "F" to the Expert Report. When asked which of the scenarios was most likely to occur, Sussman responded: "I can tell you that it's more likely that Mr. Benscher would have been trading than not trading. It's more likely that he would have continued to use leverage than not use leverage." Sussman Dep. at 284-85. Sussman also explained the different approaches to the damages calculations as follows:

Well, we want to try in doing this to minimize the number of assumptions that we're making. One way of doing that would be to, as we did here, restrict the trading of the portfolio so that the portfolio is static, they're not selling and buying. It's a static portfolio.

A second way of doing it is to say that upon creation of a new certificate, you're using a 4 to 1 leverage. You're not then, as the

> security goes up in value, relevering up in leverage, so if you keep using more and more leverage, again we're just trying to use as few assumptions as -- as possible.  And then finally, we want to use the same type terms as existed at RBS rather than making assumptions as to what new terms might look like.

Sussman Dep. at 255-56.

The cases cited by RBS do not provide a basis for relief.  In <u>Hammann v. 800 Ideas Inc.</u>, Case No. 2:08-cv-0886-LDG-GWF, 2013 WL 5436655 (D. Nev. Sept. 26, 2013), the court criticized the range of damages, but there was no indication that more than one damages calculation had been performed.  In <u>Helft v. Allmerica Life Ins. and Annuity Co.</u>, Case No. 1:03-CV-35, 2009 WL 815451, at *5 (N.D.N.Y. Mar. 26, 2009), the expert report described two scenarios, but did "not explain why it proposes two alternative scenarios, or upon what basis the Court or jury is to decide which scenario to apply."  In this case, unlike the cases cited by RBS, Conner and Sussman provided a detailed and sufficient basis for the different calculations that were performed and the assumptions underlying each of those scenarios, as well as their opinion of the likelihood of the different scenarios.

> **D.     Conner and Sussman Do Not Unjustifiably Speculate About Sherwood's Ability to Maintain a Funding Counterparty.**

RBS argues that Conner and Sussman's damages opinions unjustifiably "are based upon the assumption that Sherwood would have continued to trade with RBS N.V. through an unknown funding counterparty through December 31, 2013 – four years after UBS was no longer willing to serve in that capacity."  Motion at p. 28.  In support of its argument, RBS relies on an April 16, 2009 letter by UBS.  Motion at p. 27.  However, the referenced letter does not provide support for RBS's contentions, as discussed in Section III.A.4.d. of the Summary Judgment Opposition and, at best, creates questions for the jury.

**E.**   **Conner and Sussman's Damages Opinions Are not Based on an Unreliable Application of the "Market Adjusted Damages Measurement."**

RBS contends that "Thornapple also misapplied the damages measurement it was purporting to follow; namely, the 'market adjusted damages' theory."  Motion at p. 30.  In addition to again attempting to attack the assumptions underlying Conner and Sussman's opinions--which attempts must fail for the reasons discussed above--RBS takes issue with (a) Conner and Sussman's use of the Russell 2000 index as a proxy; and (b) Conner and Sussman's use of December 31, 2013 as the end date for their damages calculations.  Neither of these contentions has merit.

As an initial matter, RBS mischaracterizes Conner's deposition testimony about <u>Rolf v. Blyth, Eastman Dillon & Co.</u>, 637 F.2d 77 (2d Cir. 1980).  Conner cited <u>Rolf</u> as an example of a type of methodology using an adjusted market index.  Conner Dep. at 205.  Moreover, Conner stated that there are other decisions following <u>Rolf</u> and that "the principles behind the <u>Rolf</u> decision are such that the damage is deemed to be considered to be dynamic."  Conner Dep. at 208-212.  Conner further explained as follows:

> Rolf is no longer unique and it's no longer something that only exists within the Second Circuit, so that the principles behind the Second Circuit that are quite often looked to for other circuits have been embraced in every other circuit in the country in some decision or other.
>
> So are there other damage methodologies?  Sure, but the principles behind the Rolf decision are such that the damage is deemed to be considered to be dynamic.  It's not merely what money was necessarily lost at the time.  It's not assuming that it was not an out-of-pocket loss.  There's no damage.  It's basically saying there's a -- rescissory effect in the damage methodology.
>
> So from a loss causation standpoint, you're basically saying, put me back to the position ex-ante, except the position ex-ante was not merely holding the portfolio.  If you were a buy-and-hold investor, then maybe a static portfolio would be appropriate.  But if you're a hyperactive investor that gets down into the weeds and if

> you know the management, you'll buy the stock, sometimes you'll
> even offer to buy the entire company, then you have to apply that
> to that type of strategy and this is what we've done here.

Conner Dep. at 211-12.

Thus, RBS's arguments that Conner and Sussman's opinions should be excluded for failure to follow the formula set forth in Rolf are without merit. Conner did not testify that he and Sussman relied specifically on Rolf in making their damages calculations; rather, Conner cited Rolf as an example of the position that damages can be dynamic. The specific bases for Conner and Sussman's damages calculations are set forth in the Expert Report, and to the extent that RBS believes that there are deficiencies in that methodology, that is an issue to be presented to the jury at trial through any contrary evidence. See Quiet Technology DC-8, Inc., 326 F.3d at 1346 (stating that defendant's arguments about expert's failure to include all available test parameters were issues of probativeness and not admissibility).

Conner and Sussman's use of the Russell 2000 index as a proxy is not a basis for excluding their expert opinions. Conner and Sussman explained the reason for using the Russell 2000 index as a proxy:

> The choice of a Russell was because we wanted to -- to find
> something that could be a proxy for the kind of small speculative
> stocks that Mr. Benscher tended to trade in.  . . . [W]e think it
> would be reasonable that Mr. Benscher would have found other
> special situations to invest in, but, of course, we don't have the
> benefit of knowing what those special situations would have been
> at the time.
>
> So the more conservative assumption was to assume that he would
> have maintained exposure to the market in the Russell 2000 Index
> because the Russell 2000 Index was as close as we could come to
> the kinds of names that he would be involved with.

Sussman Dep. at 181-82.

Similarly, Conner explained that

> you're using the Russell as the best available proxy for the pool of
> stocks that you would draw from in managing the same approach
> of picking specific companies and using them the way you had
> before. So without speculating as to what companies those might
> actually be, you substitute the Russell Index as the pool from
> which you draw the best objective measure.

Conner Dep. at 200.

Conner and Sussman's use of the Russell 2000 index as a proxy is supported by the facts upon which they relied in reaching their conclusions, and this is an acceptable methodology. In Maiz v. Virani, 253 F.3d 641 (11th Cir. 2001), the defendants challenged the expert's "assumption that the performance of a REIT index is an appropriate gauge for the returns that Plaintiffs would have generated on the pilfered funds." Id. at 662. The Eleventh Circuit disagreed that the expert's reliance on the REIT index was improper. The court first noted that "while damages may not be determined by mere speculation or guess, it will be enough if the evidence show[s] the extent of the damages as a matter of just and reasonable inference." Id. at 664 (bracket in original) (internal quotation marks and citation omitted). The expert testified that he used the REIT index because he assumed that the Plaintiffs would have invested in U.S. real estate and that "a REIT index was an appropriate yardstick for measuring the performance of U.S. real estate generally during the relevant period." Id. The defendants argued that there was no evidence that the plaintiffs would have invested in U.S. real estate; however, the court stated that "the fact that Plaintiffs did invest in U.S. real estate on this occasion is persuasive evidence that they had earmarked the funds they contributed to the Defendants specifically for U.S. real estate. Although the proposition may be debated . . . it is enough to support the admission of Silberman's testimony, especially in conjunction with evidence that some Plaintiffs actually did invest in U.S. real estate on other occasions." Id. The court concluded that "[t]he district court,

having considered Silberman's testimony . . . concluded that there was a sufficient foundation for Silberman's assumptions, and Defendants had ample opportunity to cross-examine Silberman about those assumptions." Id. at 365.

Similarly, here, Conner and Sussman used the Russell 2000 index as a proxy based on the types of investments that Sherwood had consistently made in the past as part of its demonstrable investment strategy. This provides a sufficient basis for Conner and Sussman's use of that index and, to the extent that RBS finds error in the use of that index, then it may assert those perceived deficiencies at trial.

Likewise, Conner and Sussman's use of December 31, 2013 as the end date for their calculations is not a basis for excluding their opinions. RBS's challenge about the date used by Conner and Sussman for calculating damages goes to the weight of their opinions and not to their admissibility. For example, in Britt Green Trucking, Inc. v. FedEx National, Ltl, Inc., Case No. 8:09-cv-445-T-33TBM, 2014 WL 2861485 (M.D. Fla. June 24, 2014), the defendant challenged the methodologies used by plaintiff's expert based on the dates used in the expert's calculations, arguing that the expert should have based lost profits on the 30 days leading up to termination and not for the entire calendar year. Id. at *5. The court stated that the defendant's "objections directed to the reliability of [the expert's] report and testimony go to the weight of her testimony, rather than its admissibility." Id. at *7; see also Competitor Liaison Bureau, Inc. v. Cessna Aircraft Co., Case No. 6:08-cv-2165-Orl-28GJK, 2011 WL 1152127, at *4 (M.D. Fla. Mar. 9, 2011) (stating that "if an analysis or study is based on [an] inaccurate date, such flaws are more appropriate for cross-examination"). Accordingly, any challenges that RBS has to the date used by Conner and Sussman is a matter to take up on cross-examination.

**F.      Conner and Sussman Considered Costs in Reaching Their Expert Opinions.**

RBS also argues Conner and Sussman's lost profit calculations are unreliable because "Thornapple completely fails to account for the costs Sherwood clearly faced had it stayed in business." Motion at p. 33. This argument is entirely without merit. RBS states that "Thornapple never considered the costs Sherwood would face in maintaining the certificates it possessed on September 17, 2008." Motion at p. 33. However, this statement is plainly untrue, as Conner and Sussman did in fact consider the cost of financing in reaching their opinions. Sussman explained that the cost that Sherwood would have needed to pay to maintain its positions until the sales dates was included in accreting the financing level. Sussman Dep. at 197 and 246. Sussman further explained that "[t]he certificates, the single certificates all have a -- a funding cost embedded in them." Sussman Dep. at 280-81. Further, the $11 million of additional <u>capital</u> that RBS argues Sherwood would have needed to continue to roll its positions is, by definition, not an operating expense or cost.

RBS further contends that Conner and Sussman did not "include the more mundane -- and obvious -- costs of running a business." Motion at p. 34. However, RBS offers no evidence that Sherwood would have incurred any "labor, travel, overhead, technology, professional fees, commissions or any other customary business expense." Motion at p. 34. Sherwood is not a "traditional" business which would ordinarily incur these types of expenses. For example, Sherwood is not the type of business which has to incur expenses in order to produce or manufacture a product or to furnish a service. Rather, Sherwood's primary business is making investments, which Benscher was able to do from his home office without having to expend the types of overhead expenses that a more traditional business would have. Indeed, Sherwood's Second Amended Plan of Reorganization that this Court approved provides that Sherwood "will

continue to operate its reorganized business, <u>with low operating expenses</u>."  Doc. No. 83 at 17 (emphasis added).

IV.     **Conner and Sussman's Expert Opinions Will Assist the Trier of Fact.**

The damages opinions offered by Conner and Sussman are reliable and will assist the trier of fact.  As discussed above, Conner and Sussman's opinions are not based on mere "after-the-fact hypothetical musings about what [Benscher] 'would have done.'"  Motion at p. 35. Moreover, because lost profits are the proper measure of damages in this case, Conner and Sussman's analysis has the requisite fit with the facts of this case and Sherwood's theory of liability.

A.     **Conner and Sussman's Opinions Have a Proper Foundation and Are Not Merely *Ipse Dixit* Opinions.**

Conner and Sussman's opinions are based on more than their own assertions of what result the jury should reach.  RBS argues that "nowhere in the report does Thornapple explain their rationale in arriving at the opinions and conclusions, or attempt to apply any scientific or other technical standards to explain the basis of the opinions and conclusions."  Motion at p. 39. This is simply untrue.  As discussed above, Conner and Sussman's opinions and conclusions are the result of their analysis and the methodology described in the report and in their deposition testimony, and therefore their opinions are proper.  <u>See</u> <u>Adams v. Laboratory Corp. of America</u>, Case No. 13-10425, 2014 WL 3724190, at *5 (M.D. Fla. July 29, 2014) (determining that an expert's opinion was not an *ipse dixit* assessment where the expert "formed her opinion by using reliable tools, applying an established body of medical knowledge, and drawing on her extensive experience in the field").

RBS argues that in Conner and Sussman's "first 'opinion' contained on page 5 of their report, Thornapple opines that RBS N.V. was directly responsible for causing Sherwood's lost

profit damages, but they never identify *how* industry standards guide their causation opinion."
Motion at p. 39.  RBS similarly argues that "Thornapple concludes that RBS N.V. had the
obligation to continue to act as it did in the past and continue trading with Sherwood.
Thornapple, however, never identifies what kind of purported obligation RBS N.V. supposedly
locked itself into."  Motion at p. 39.  RBS also argues that "Thornapple opines that RBS N.V.
terminated the relationship without cause, but fails to explain the industry standards guiding that
conclusion, identify any standard or authority requiring such a relationship to be terminated only
'for cause' or identify any circumstances that might otherwise constitute 'cause.'"  Motion at p.
39.  These arguments are without merit, as the basis for Conner and Sussman's opinions are
detailed in the Expert Report.  Conner and Sussman relied upon "the standards and practices of
the securities industry which are widely known and understood in their areas of professional
expertise" to analyze the parties' relationship and reach their conclusions.  Expert Report at p. 3.
Conner and Sussman's analysis of the course of conduct between the parties is discussed
extensively in pages 14-25 of the Expert Report.

RBS also argues that "[w]ith respect to the second 'opinion' contained on page 5 of their
report, Thornapple never identifies or explains the industry standard with respect to when or how
an individual or entity becomes a client."  Motion at p. 39.  This contention is likewise without
merit.  The basis of Thornapple's opinions regarding Sherwood's status as a client of RBS is
discussed at pages 7-9 of the Expert Report.  RBS's criticisms are simply the fodder of cross-
examination.

The cases cited by RBS can be distinguished from the facts of this case.  For example, in
<u>McDowell v. Brown</u>, 392 F.3d 1283, 1300 (11th Cir. 2004), the expert "simply made a blanket
statement that the delay caused the paralysis, but gave no opinion as to whether the sum of the

delays compounded McDowell's injuries, or if just one delay created the damage." Conner and Sussman have made more than just a "blanket statement" and have gone into depth regarding the bases for their opinions and conclusions. Likewise, in <u>Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Fla.</u>, 402 F.3d 1092 (11th Cir. 2005), the expert's opinion that MCDC's training was inadequate was excluded because the expert did not articulate a general standard or an explanation of why the training was inadequate. Other opinions offered by the expert were similarly excluded on the grounds that they were "unsubstantiated by any proffered facts, explanation, or analysis" or presented purely legal conclusions "without any supporting factual basis." <u>Id.</u> at 1112-13. In contrast, Conner and Sussman's opinions are based on supporting facts, and they have explained in detail the bases for their opinions, which draw on their extensive experience as actual participants in the relevant markets.

### B. Conner and Sussman's Opinions Are Not Improper Legal Conclusions.

RBS also argues that Conner and Sussman's opinions should be excluded as pure legal conclusions. Motion at p. 41. This argument also fails. Conner and Sussman do not impermissibly opine on any legal duties or obligations. Rather, any statements about such duties or obligations are made in the context of reaching their opinions based on the practices and customs of the securities industry.

"'Although testifying experts may not offer legal conclusions, Federal Rule of Evidence 704(a) provides, in relevant part, that 'testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.''" <u>S.E.C. v. SkyWay Global, LLC</u>, Case No. 8:09-cv-455-T-23TBM, 2010 WL 5058509 (M.D. Fla. Dec. 6, 2010). In <u>Skyway Global, LLC</u>, the defendant offered an expert opinion that the defendant was not in the business of effecting transactions in securities and that the defendant's activities did not require registration as a broker-dealer under securities laws. <u>Id.</u> at

26

*4.  The plaintiff sought to exclude the opinion on the grounds that it contained inadmissible legal conclusions.  Id. at *3.  The court determined that the expert opinion was admissible, noting that "Bloom undoubtedly possesses the qualifications necessary to testify on the matter his opinion addresses.  Even though Bloom's opinion embraces an ultimate issue, to the extent that Bloom's opinion derives from a reliable basis, offers an insight into the custom and practice of broker registration in the securities industry, and assists the trier of fact, Bloom's opinion is admissible."  Id. at *4.  Similarly, even if Conner and Sussman's opinions may embrace ultimate issues in the case, their opinions derive from a reliable basis (as discussed throughout this Motion), offer insight into the customs and practices of the securities industry, and assist the trier of fact.  Accordingly, their opinions are admissible.

Similarly, in Travelers Indemnity Co. of Illinois v. Royal Oak Enterprises, Inc., Case No. 5:02-CV-58-OC-10GRJ, 2004 WL 3770571 (M.D. Fla. Aug. 20, 2004), the plaintiff argued that the defendant's expert's opinions about the plaintiff's duty to defend and existence of a conflict of interest should be stricken because they are impermissible legal conclusions.  Id. at *1.  The defendant argued that the expert's opinions were "proper, and any so-called 'legal conclusions' expressed in the report are properly included as the basis and reasons for his opinions."  Id. at *2. The court rejected the plaintiff's argument and stated "that Posner's report does not offer legal opinions or conclusions of law.  Rather, it discloses a series of opinions as to the customs and practices of the insurance industry concerning the issues in dispute.  As those customs and practices throughout Posner's twenty-five (25) years in the field have undoubtedly been shaped by insurance law, it is understandable that some of the statements made in his report reflect this reality."  Id. at *2.

The court went on to state as follows:

> As the Eleventh Circuit has noted, "the law in this circuit pertaining to the admissibility of an expert's opinion couched in legal terms is not crystal clear." However, where, as here, the substance of the expert's testimony concerns ordinary practices and trade customs which are helpful to the fact-finder's evaluation of the parties' conduct against the standard of ordinary practice in the insurance industry, his passing reference to a legal principle or assumption in an effort to place his opinions in some sort of context will not justify the outright exclusion of the expert's report in its entirety.

Id. at *2 (footnotes omitted).

The same is true here. Any reference to legal principles or assumptions used by Conner and Sussman is only an effort to place their opinions in context. Moreover, Conner and Sussman's opinions are based on their extensive experience with the standards and ordinary practices in the securities industry, and it is understandable if their report reflects this reality. See Warfield v. Stewart, Case No. 2:07-cv-332-FtM-33SPC, 2009 WL 2421594, at *2 (M.D. Fla. July 31, 2009) (stating that expert's method was reliable where he applied his education and experience in the "field to the specific facts of this case to reach his opinions on the agency relationship and standard of care expected of a transactional broker under the circumstances") (internal quotation marks omitted). In Warfield, the court further stated that it was appropriate for the expert to testify as to the standard of care for the defendants and that should his "testimony begin to invade the Court's exclusive province of instructing the jury on the law, Plaintiffs are free to lodge appropriate objections." Id. at *3.

Moreover, in the process of performing its analysis, an expert may touch on legal concepts generally in order to explain its assumptions or to put its opinions in context. See Maiz, 253 F.3d at 666. In Maiz, the defendants argued that the plaintiffs' expert "repeatedly offered 'legal' opinions regarding the effect of disputed provisions" in the parties' agreements. Id. The

Eleventh Circuit found no reversible error in the admission of the expert's testimony.  The court explained that the expert "is certainly qualified to opine on forensic accounting issues, and as part of that process he was entitled to state reasonable assumptions regarding the requirements of the applicable contracts in order to put his opinions in context.  Our review of Barker's testimony confirms that, to the extent he spoke of the contracts, he generally did so in the context of setting forth or explaining reasonable assumptions he was asked to make by counsel."  Id. at 667. Likewise, in Voter Verified, Inc. v. Election Systems & Software, Inc., Case No. 6:09-cv-1969-Orl-19KRS, 2011 WL 149275 (M.D. Fla. Jan. 11, 2011), the court stated that an expert was entitled to set forth the legal definitions he was using to reach his conclusions and then apply those legal principles in his analysis.  Id. at *3-4.  Similarly, here, to the extent that Conner and Sussman's opinions touch on "legal" issues, they did so generally in the context setting forth or explaining their assumptions and opinions.

Additionally, the court may properly instruct the jury regarding the expert's role at trial. The Eleventh Circuit has "recognized that an instruction may be used to prevent a jury from placing too much weight on an expert's legal conclusions."  Maiz, 253 F.3d at 667.  These instructions can address "the possibility that the jury would be misled into believing that [the expert], rather than the court, was the source of the legal standards applicable to the case."  Id. Accordingly, to the extent that RBS believes that Conner and Sussman's opinions include legal conclusions, then it can seek to have an instruction at trial informing the jury of the role of expert testimony.

Similarly, if RBS has an objection to the testimony offered at trial, then RBS can make an objection at that time.  See Britt Green Trucking, Inc., 2014 WL 2861485, at *7.  In Britt Green Trucking, Inc., the plaintiff argued that the defendant's expert's opinion about whether the

defendant breached the contract was a matter in which the expert had no expertise and would determine a legal question.  Id.  The defendant responded that the expert was only asserting an opinion as to whether an estimate was unsupported by the contract.  The court noted that the plaintiff's concerns appeared to be moot but that "in the instance that [the expert] attempts to provide the jury with testimony that exceeds the bounds of his expertise, Plaintiffs are free to raise an appropriate objection during trial."  Id. at *8.

Conner and Sussman's expert opinions do not offer pure legal conclusions and therefore are distinguished from the opinions at issue in the cases cited by RBS.  For example, in Montgomery v. Aetna Casualty & Surety Co., 898 F.2d 1537 (11th Cir. 1990), the court excluded an expert's opinion regarding the scope of Aetna's duty under an insurance policy, explaining that the "interpretation of an insurance contract is a question of law to be decided by the judge."  Id. at 1541 n. 9.  Similarly, in Harbor Communities, LLC v. Landmark American Ins. Co., Case No. 07-14336-CIV, 2008 WL 5532021 (S.D. Fla. Aug. 7, 2008), the court excluded expert testimony that an insurance policy provided coverage which was contrary to the court's prior determination.  Conner and Sussman are not attempting to interpret the terms of a contract but rather opine on the relationship between the parties based on the facts of the case in light of their past experience in the field.

In Chick-Fil-A v. CFT Development, LLC, Case No. 5:07-cv-501-Oc-10GRJ, 2009 WL 1754058 (M.D. Fla. June 18, 2009), the court excluded an expert's opinion regarding an interpretation of a restrictive covenant, which was a determination for the court to make as a matter of law.  Conner and Sussman, on the other hand, do not opine on the interpretation of a matter to be decided by the court.  Instead, Conner and Sussman's opine on facts which are properly within the province of expert opinions.

In <u>In re Rosenberg</u>, Case No. 09-13196-BKC-AJC, 2012 WL 3870351 (Bankr. S.D. Fla. Sept. 6, 2012), the plaintiff sought to have an expert "testify concerning 'the legal consequences and ramifications of filing an involuntary petition, including the concept of bad faith and damages stemming as a result of the same.'" <u>Id.</u> at *1.  By the plaintiff's own statements, the opinions offered were legal conclusions, and are distinguished from the opinions sought to be offered by Conner and Sussman.  Similarly, in <u>Konikov v. Orange County, Florida</u>, 290 F. Supp. 2d 1315 (M.D. Fla. 2003), the court excluded expert testimony as to the constitutionality of a county ordinance.  Conner and Sussman, by contrast, do not seek or purport to instruct the Court or the jury on the applicable law.

Additionally, Conner and Sussman do not improperly opine on the "state of mind, motives or intent of RBS N.V. and others."  Motion at p. 45.  As can be seen by Conner and Sussman's overview of their opinions, they do not purport to offer any opinion on state of mind, motives, or intent, and thus this case can be distinguished from the cases cited by RBS.  <u>See, e.g.</u>, <u>Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC</u>, Case No. 09-61490-Civ, 2011 WL 2295269 (S.D. Fla. June 8, 2011) (expert sought to offer testimony regarding Pandora LLC's intent in opening a store); <u>Tindall v. H & S Homes, LLC</u>, Case No. 5:10-CV-044(CAR), 2012 WL 3241885 (M.D. Ga. Aug. 7, 2012) (expert sought to opine that defendant's intent was to avoid paying a judgment).

Moreover, it is premature at this stage to exclude any of Conner and Sussman's opinions. Rather, the contentions made by RBS are properly raised at trial.  For example, in <u>Perrien v. Nationwide Mutual Fire Ins. Co.</u>, Case No. 8:08-cv-2586-T-30TGW, 2010 WL 2921621 (M.D. Fla. July 23, 2010), the plaintiffs argued that the defendant's experts offered impermissible legal conclusions that defendant acted in good faith in handling plaintiff's claims and that the experts

31

should not be permitted to testify regarding the parties' intent.  Id. at *6.  In response, the defendant argued "that it would be premature to rule on the admissibility of the opinions . . . prior to the proffer of their testimony at trial."  Id. at *7.  The court agreed, concluding "that it would be premature to exclude Defendant's experts at this stage.  Although the Court will not allow an expert to offer impermissible legal conclusions, testimony of which he is not qualified to opine, redundant testimony, irrelevant testimony, and testimony based on speculation as to the parties' intent, these issues shall be ruled upon at trial after the voir dire of the experts and the Court may exclude any testimony at that point if appropriate."  Id. at *7.  Similarly, here, RBS's arguments about whether Conner and Sussman's opinions include legal opinions are properly left to the time of trial.

RBS takes snippets of the Expert Report out of context and argues that "Thornapple merely tells the factfinder that RBS N.V. owed a legal obligation, breached the parties' agreement, breached various unidentified duties owed to Sherwood and proximately caused Sherwood's damages.  This is wholly inappropriate as it improperly invades the province of the Court to determine what the law is, and the legal implications of RBS N.V.'s conduct."  Motion at p. 42.  However, the Expert Report does no such thing.  The expert opinions of Conner and Sussman are the result of a proper analysis which is described at length in the Expert Report and in their depositions.  Moreover, contrary to RBS's contentions, Conner and Sussman do not opine on the existence of a contract or a breach of contract.  Thus, there is no basis for excluding Conner and Sussman's opinions on the basis that they are mere legal opinions.

### C.      Conner and Sussman's Expert Report Does Not Contain Inappropriate Factual Narrative.

RBS argues that Conner and Sussman's report contains assumptions of fact which "consist entirely of a factual narrative that appears to be a mere summation of Sherwood's

slanted version of the facts underlying this case" and that "[n]ever once does Thornapple explain if -- let alone how -- they verified these facts." Motion at p. 44-45. Conner and Sussman's report does not contain an improper factual narrative. As discussed above, Conner and Sussman have explained how they verified the facts and assumptions underlying their opinions.

The factual background contained in the expert report is not a gratuitous narrative. The background is necessary to set forth the facts upon which Conner and Sussman relied in reaching their opinions. Federal Rule of Evidence 703 provides, in pertinent part, that "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Moreover, "'[a]n expert is . . . permitted to base his opinion on a particular version of the disputed facts and the weight to be accorded to that opinion is for the jury.'" Feliciano v. City of Miami Beach, 844 F. Supp. 2d 1258, 1265 (S.D. Fla. 2012) (ellipses in original). In Feliciano, the court noted that "[i]n the instant case, there is a marked discrepancy between the plaintiff's and the defendants' version of the events. If the jury believes the plaintiff, then [the expert's] opinions regarding the use of excessive force will likely be apportioned more weight. If, on the other hand, the jury credits the defendants' testimony as to what transpired on the date in question, the jury will likely discount [the expert's] opinion. In either case, it is well within the province of the jury to weigh the credibility of these competing versions." Id. Similarly, in this case, if RBS believes that Conner and Sussman's opinions are flawed because they rely on Sherwood's "version" of the facts, then RBS can present its version of the facts to the jury, who will then consider the evidence and determine the appropriate weight to place on the experts' opinions.

The cases cited by RBS can be distinguished from this case. For example, in In re Traysol Products Liability Litigation, Case No. 08-MD-01928, 2010 WL 4259332 (S.D. Fla.

Oct. 21, 2010), the court excluded a factual narrative "that is largely devoid of expert regulatory analysis and does not provide a reliable basis for his broad conclusory opinions on this subject." Id. at *8.  Similarly, in In re Traysol Products Liability  Litigation--MDL--1928, 709 F. Supp. 2d 1232 (S.D. Fla. 2010), the court excluded narrative testimony that did not relate to the expert's opinions.  Id. at 1337.  Likewise, in Synder v. Wells Fargo Bank, N.A., Case No. Civ. 4496(SAS), 2012 WL 4876938 (S.D.N.Y. Oct. 15, 2012), the court excluded a narrative which "states conclusions without any reference to his purported expertise."  Id. at *4.  Finally, in Fisher v. Ciba Specialty Chemicals Corp., 238 F.R.D. 273 (N.D. Ala. 2006), the court excluded an expert report where the "statements of alleged fact do not appear to benefit from, or to be based to any extent on, McFaddin's status as a regulatory expert."  Id. at 281.  In contrast, in the Expert Report, Conner and Sussman provide industry insight and analysis which guides and provides the foundation for their opinions.  The facts set forth in the Expert Report are tied to Conner and Sussman's expert opinions, and there is no basis for excluding Conner and Sussman's opinions on the grounds that they contain an improper factual narrative.

## CONCLUSION

The arguments raised in the Motion are without merit and do not provide a basis for excluding Conner and Sussman's expert opinions.  Instead, the arguments made in the Motion are issues that are properly addressed at trial.  As such, the Motion should be denied in its entirety.

Respectfully submitted this 15th day of August, 2014.

/s/ Michael J. Beaudine
Michael J. Beaudine, Esq.
Florida Bar No. 0772763
beaudine@lseblaw.com
R. Scott Shuker, Esq.
Florida Bar No. 0984469
rshuker@lseblaw.com
Justin M. Luna, Esq.
Florida Bar No. 0037131
jluna@lseblaw.com
**LATHAM, SHUKER, EDEN &
BEAUDINE, LLP**
111 N. Magnolia Avenue, Suite 1400
Orlando, Florida  32801
Telephone:     (407) 481-5800
Facsimile:     (407) 481-5801

*Attorneys for Debtor/Plaintiff, Sherwood
Investments Overseas Limited, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 15, 2014, a true copy of the foregoing has been furnished, either electronically and/or by U.S. Mail, to the parties listed on the attached Service List.

/s/ Michael J. Beaudine
Michael J. Beaudine, Esq.

## SERVICE LIST

Sherwood Investments Overseas Limited, Inc., Debtor/Plaintiff
Case No. 6:10-bk-00584-KSJ
Adv. Proc. No. 10-158

| | |
|---|---|
| I. William Spivey, II, Esq.<br>Greenberg Traurig, P.A.<br>450 S. Orange Avenue, Suite 650<br>Orlando, Florida 32801<br>E-mail: spiveyw@gtlaw.com<br>*Counsel for Defendant The Royal Bank of*<br>*Scotland N.V., f/k/a ABN AMRO Bank, N V.* | Andrew M. Brumby, Esq.<br>Shutts & Bowen, L.L.P., Suite 1000<br>300 S. Orange Avenue<br>Orlando, Florida 32801<br>E-mail: abrumby@shutts.com<br>*Counsel for Pentagon Apollo, Ltd.* |
| Mark D. Bloom, Esq.<br>Greenberg Traurig, P.A.<br>333 SE 2nd Avenue, Suite 4400<br>Miami, Florida 33131<br>E-mail:bloomm@gtlaw.com<br>*Counsel for Defendant The Royal Bank of*<br>*Scotland N.V., f/k/a ABN AMRO Bank, N V.* | Rosemary Hayes, Esq.<br>Hayes Law, PL<br>830 Lucerne Terrace<br>Orlando, Florida 32801<br>E-mail: rhayes@const-law.com<br>*Counsel for Lee Maher* |
| Frank M. Wolff, Esq.<br>Wolff, Hill, McFarlin & Herron, P.A.<br>1851 W. Colonial Drive<br>Orlando, Florida 32804<br>E-mail: fwolff@whmh.com<br>*Counsel for Sherwood Investments Overseas*<br>*Limited, Inc.* | Maureen A. Vitucci, Esq.<br>GrayRobinson P.A.<br>301 E. Pine Street, Suite 1400<br>Orlando, Florida 32801<br>E-mail: mvitucci@gray-robinson.com<br>*Counsel for Centennial Bank, f/k/a Old*<br>*Southern Bank* |
| Miriam G. Suarez, Esq.<br>*Office of the U.S. Trustee*<br>400 West Washington Street, Suite 1100<br>Orlando, Florida 32801<br>E-mail: miriam.g.suarez@usdoj.gov | |