# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

In re

SHERWOOD   INVESTMENTS
OVERSEAS LIMITED, INC.,

      Debtor.

_____

Bankr. Ct. Case No:  6:10-bk-584-KSJ

SHERWOOD   INVESTMENTS
OVERSEAS LIMITED, INC.,

      Plaintiff,

v.

THE ROYAL BANK OF SCOTLAND
N.V., f/k/a ABN AMRO BANK N.V.,

      Defendant.

_____

Adversary Case No:  6:10-ap-158-KSJ
Dist. Ct. Case No: 6:15-cv-1469-Orl-40TBS

## <u>ORDER</u>

This cause comes before the Court without oral argument[1] on the following:

1. Defendant's Dispositive Motion for Summary Judgment (Doc. 2);

2. Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment (Doc. 4);

3. Defendant's Reply to Plaintiff's Memorandum of Law in Opposition to Defendant's Dispositive Motion for Summary Judgment (Doc. 7);

---

[1]   On September 20, 2016, more than one year after this case was submitted for the undersigned's review, Plaintiff requested oral argument for the first time.  (Doc. 31).  Plaintiff's request is denied as untimely.  *See* M.D. Fla. R. 3.01(j) (requiring that all requests for oral argument accompany the filing on which oral argument is requested).  Moreover, based on the Court's review of the record evidence and parties' respective briefs, the Court does not require the benefit of oral argument to duly consider the issues raised herein.

4. Defendant's Motion to Exclude Expert Opinions of Bruce S. Foerster (Doc. 11);

5. Defendant's Motion to Exclude Expert Opinions of Conner & Sussman (Doc. 12);

6. Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Exclude Expert Opinions of Conner & Sussman (Doc. 13);

7. Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Exclude Expert Opinions of Bruce S. Foerster (Doc. 14);

8. Defendant's Combined Reply to Plaintiff's Memoranda of Law in Opposition to Defendant's Motions to Exclude Expert Opinions of Bruce S. Foerster, Robert E. Conner, and Richard J. Sussman (Doc. 15);

9. The Bankruptcy Court's Proposed Memorandum Opinion Granting Defendant's Motion for Summary Judgment (Doc. 20-1);

10. The Bankruptcy Court's Proposed Final Summary Judgment (Doc. 20-2);

11. The Bankruptcy Court's Proposed Order Excluding Expert Testimony of Plaintiff's Expert Bruce S. Foerster (Doc. 20-3);

12. The Bankruptcy Court's Proposed Order Excluding Expert Testimony of Plaintiff's Experts Conner and Sussman (Thornapple) (Doc. 20-4);

13. Plaintiff's Objections to Proposed Memorandum Opinion and Related Orders and Memorandum of Law in Support Thereof (Doc. 23); and

14. Defendant's Response in Opposition to Plaintiff's Objections to the Bankruptcy Court's Proposed Memorandum Opinion and Related Orders (Doc. 24).

Upon a de novo review of the record, the Court will enter final summary judgment in favor of Defendant on all of Plaintiff's claims.

## I.   INTRODUCTION

This cause comes to the undersigned district judge for review of the Bankruptcy Court's proposed orders disposing of Defendant's motion for summary judgment and two motions to exclude Plaintiff's experts, which Defendant filed in the parties' adversarial bankruptcy case.  In *Stern v. Marshall*, 564 U.S. 462 (2011), the United States Supreme Court indicated that bankruptcy courts might not have constitutional authority to enter final judgments on certain types of "core" claims filed within adversary bankruptcies—since referred to as "*Stern* claims." Notwithstanding, the Supreme Court recently decided in *Wellness International Network, Ltd. v. Sharif*, 135 S. Ct. 1932 (2015), that, regardless of whether a bankruptcy court actually has authority to enter final judgment on a *Stern* claim, the parties to an adversary proceeding can consent to the bankruptcy court entering such a final judgment—much in the same way parties in this Court can consent to a magistrate judge finally adjudicating their claims.

This case involves the type of *Stern* claims which would require the parties' consent to allow the Bankruptcy Court to enter final judgment.  However, Defendant did not consent, as is its right.  Accordingly, the Bankruptcy Court prepared three orders on Defendants' outstanding motions and submitted them for this Court's review.  Plaintiff has submitted specific objections to the Bankruptcy Court's orders, and these objections are ripe for adjudication.

## II.   BACKGROUND

Defendant, The Royal Bank of Scotland N.V. f/k/a ABN AMRO Bank N.V. ("RBS"), financed complex derivatives trading for the Plaintiff and Debtor, Sherwood Investments Overseas Limited, Inc. ("Sherwood"), from 2006 until the onset of the stock market crisis in September 2008. Neither party objects to the Bankruptcy Court's recitation of the facts in the Proposed Memorandum Opinion. For the benefit of clarity, the Court repeats that recitation in substantial form here:[2]

### A.   The Parties' Relationship Before September 2008

Sherwood's claims arise out of the abrupt end of its trading relationship with RBS that had started over two years prior to September 2008. Sherwood would speculate on stocks through risky derivative instruments crafted by RBS. Sherwood also owned a subsidiary, Sherwood Farms, which operated as a commercial orchid farm in Central Florida.

RBS created derivative instruments, called Mini-Long Certificates ("Certificates"),[3] and pegged the price of each Certificate to the value of other stocks (the "Underlying Stock"), usually a U.S. small-cap stock ("Single Stock Certificates") or a bundle of different stocks ("Dynamic Basket Certificates"). Sherwood's authorized representative, Julian Benscher, directed all of Sherwood's trading and selected the stocks Sherwood included

---

[2]   The Court additionally incorporates by reference the Bankruptcy Court's account of the facts as stated in the Proposed Memorandum Opinion along with all citations to the record (Doc. 20-1, pp. 2–14 & nn.3–73).

[3]   The Terms and Conditions for the Certificates described them as follows: "Mini Long certificates are similar to ordinary certificates, in that they track in a linear manner the underlying asset(s). The difference between a Mini Long certificated and an ordinary certificated is that in the case of the Mini Long certificate, the amount needed to invest to give the same participation rate in the underlying asset(s) is considerable less. Therefore, the percentage gain if the underlying asset(s) rises is much higher in Mini Long certificates than normal certificates. This is the leverage effect." Terms and Conditions to Rentech Certificates Issued August 15, 2008, Freeman Decl. Ex. C, Adv. Doc. No. 208-1 at 48 of 87.

in each purchase.  The Certificates provided a mechanism for Sherwood to borrow money from RBS to speculate on securities with great leverage, similar to margin trading. But, in practice, the Certificates' features are even more complicated.

For every Certificate, RBS financed 75%–80% of the Underlying Stock's price (the "Financing Level"), and Sherwood paid RBS the remaining 20%–25%. Each Certificate had a stop-loss level[4] set above the Financing Level. A stop-loss is a common feature in securities trading to limit risk: when a security's price falls below the stop-loss level, the broker, here RBS, sells the security.  Here, when the Underlying Stock's market price fell below the stop-loss level, a Certificate was said to have "knocked out" or terminated.[5] RBS, which had purchased shares of the Underlying Stock to hedge its loan to Sherwood, would sell these shares, recoup its financing costs plus interest, and pay Sherwood the difference between the stop-loss level and the Financing Level, if any. An example may help explain this complicated trading relationship.

Assume Stock A's price is $4.90/share. Sherwood paid $1.00/share and borrowed $3.90/share from RBS to fund a Certificate. The stop-loss level was $4.30/share. The Financing Level initially would be $3.90/share but would increase over time as interest accrued. If the stock's market price fell below $4.30, the Certificate "knocked out" and

---

4    A "stop-loss" or a stop order is:

> [A] direction given by the purchaser or seller, as the case may be, to his broker, to the effect that, if the commodity on the market touches the price named, the broker shall close the trade by selling or buying, as the case may be, at the best available price. It may not be possible for the broker, when the price has reached the "stop" figure, to close out at that price, but he must do the best he can at that moment. It is a measure of protection which the operator provides for himself against loss beyond a certain point in a fluctuating market, and it is the duty of the broker who accepts a contract under such conditions to comply with the instructions.

*Alexas v. Post & Flagg*, 123 S.E. 769, 769–70 (1924); *see also* 12 Am. Jur. 2d Brokers § 190.
5    Bayley Dep. 71–75, Oct. 21, 2013, Adv. Doc. No. 208-21.

terminated.[6] RBS would then sell its underlying hedge stock for $4.25/share, when the Financing Level was $3.95/share.  RBS would retain its financing amount from the sale of the hedge stock and pay Sherwood the difference, $0.30/share.

The stock's price in this example went down, and Sherwood took a loss. RBS however still made a modest gain in interest charges. If, instead, the market price increased to $5.95/share, and Sherwood exercised the Certificate, then RBS would owe Sherwood the difference between the "Final Reference Price" ($5.95) and the financing level ($3.95). The Certificate's value to Sherwood would then be $2.00/share—a 100% increase from its initial investment of $1.00/share. Sherwood could cash out this gain with RBS and invest in a Certificate with a higher stop-loss level.[7]

RBS hedged any loss from its loan to Sherwood caused by the potential increase of the Certificate value by purchasing shares of the Underlying Stock.[8] If the security increased in value—causing RBS to owe money to Sherwood if the Certificate was exercised—RBS could sell the underlying stock, which would have increased in value along with the Certificate, to pay Sherwood. RBS simultaneously earned interest on the financing it provided to Sherwood. Sherwood obtained large amounts of leverage and the potential to reap great gains. Concomitantly, Sherwood carried enormous risk in these transactions.[9]

---

[6]   The "price" of the stock was determined by RBS and was called the "Final Reference Price."

[7]   In some instances, RBS had "investable" Certificates available when the value of the Underlying Stock increased and eliminated the need for RBS to create new Certificates through Euroclear, their clearing agent. Certificates remained investable when Sherwood moved out of them into Certificates with higher stop-loss levels. Bayley Dep. 73–75, Adv. Doc. No. 208-21.

[8]   Freeman Dep. I at 104–06, October 5, 2012, Adv. Doc. No. 223-12.

[9]   The Terms and Conditions of each Certificate even warned of this great risk: "Investors should be aware that the leverage effect from holding Mini Long certificates could result in gaining or losing a greater percentage of the investment than would occur through a direct investment in the underlying asset(s). The maximum loss to the investor is the initial amount invested. Investors must expect to suffer a loss

Each Certificate had a term sheet and a prospectus, detailing the instrument's features and operation.[10] According to RBS's corporate representative, Richard Freeman,[11] the prospectus was "the governing document that define[d] the payoff products" and was filed with the clearing agent, Euroclear, "when an instrument was traded."[12] "It define[d] the law under which the product [was] traded and the requirements and expectations that go with that."[13] The prospectus was filed with Euroclear.  The client rarely received a copy.[14] RBS usually sent the term sheet (a short form of the prospectus) to the client.[15]

From 2006 until mid-September 2008, whenever a Certificate "knocked out," RBS gave Sherwood the opportunity to "roll" its investment.[16] Rolling allowed RBS and Sherwood to create a new Certificate with a new stop-loss level and Financing Level. Sherwood would "roll" whatever amount it was due from the termination of the former Certificate into the new Certificate, and RBS would again finance most of the transaction. In betting parlance, rolling is similar to keeping all of your winnings on "red."  Sherwood would still owe RBS its additional 20%–25% contribution needed to fully settle the trade (the "Settlement Amount"). If Sherwood rolled a Certificate after a "knock out," Sherwood then would hold a new Certificate with a lower stop-loss level. RBS continued to earn

---

if the market price/value of the underlying asset(s) falls." Terms and Conditions to Rentech Certificates Issued August 15, 2008, Freeman Decl. Ex. C, Adv. Doc. No. 208-1 at 48 of 87.

[10]  Freeman Dep. I at 92, Adv. Doc. No. 208-12. Sample prospectuses are located at Exhibits 7 & 8 to Adv. Doc. No. 223. Examples of the operative term sheets sent by RBS to Benscher are located at Adv. Doc. No. 208-1 at 42–50.

[11]  Richard Freeman was, at all relevant times, RBS's "global head of retail trading." Freeman Dep. II at 8, Oct. 30, 2013, Adv. Doc. No. 222-1.

[12]  Freeman Dep. II at 48, Adv. Doc. No. 222-1.

[13]  *Id.*

[14]  Freeman Dep. I at 92, Adv. Doc. No. 208-12; Freeman Dep. II at 48–49, Adv. Doc. No. 222-1. The clearing agent issued the ISIN number for each new Certificate, in effect creating the security

[15]  Freeman Dep. II at 49–50, Adv. Doc. No. 222-1.

[16]  *See generally* Bayley Dep. 71–76, Adv. Doc. No. 208-21. "Rolling" also is referred to as restriking in some of the parties' filings.

interest and avoided the transaction costs associated with unwinding its hedge positions each time a Certificate terminated.

Sherwood was never a formal client of RBS because Sherwood did not meet RBS's risk management criteria.[17] But, in the wild trading days of 2006–2008, the parties found a workaround that made an already complicated trading relationship even more complex. RBS required Sherwood to operate through an approved counterparty—UBS, a Switzerland-based bank. When Sherwood and RBS wanted to execute a trade, RBS would prepare and send "Instructions" containing the details of the trade first to Sherwood and, if approved, second to UBS.[18] UBS then would pay the required Settlement Amount from monies in Sherwood's accounts maintained at UBS. The Instructions' settlement terms were usually on a T+2 or T+3 basis, meaning UBS would pay settlement to RBS (on behalf of Sherwood, with Sherwood's funds) two or three days after the trade.[19]

Sherwood maintained three accounts at UBS. The first account was unencumbered and belonged solely to Sherwood. Sherwood managed the monies in the remaining two accounts on behalf of third parties, the Pentagon entities: Pentagon Bernini and Pentagon Hercules (collectively, "Pentagon"). The second of Sherwood's UBS accounts was pledged to Pentagon Bernini, and the third was pledged to Pentagon Hercules. Sherwood could not authorize UBS to transfer monies from the pledged accounts without the consent of Pentagon.

Because RBS did not take Sherwood on as a formal client, their relationship was not governed by RBS's standard "Terms of Business," or any written agreement for that

---

[17]   *See* Freeman Dep. I at 41–46, Adv. Doc. No. 208-12.
[18]   Freeman Dep. I at 123-124, Adv. Doc. No. 208-12; Freeman Dep. II at 45–46, Adv. Doc. No. 222-1.
[19]   Freeman Dep. I at 123–124, Adv. Doc. No. 208-13; Bayley Dep. 109–10, Adv. Doc. No. 208-21.

matter. The parties' business relationship was dictated by their course of conduct and, as Sherwood argues, by implied contractual obligations. The key aspect of this alleged implied contractual relationship is the "rolling" feature where RBS would permit Sherwood to roll terminated Certificates into new Certificates, upon payment of the new Settlement Amount. Sherwood argues RBS was contractually obligated in perpetuity to give Sherwood the opportunity to roll its investments into new Certificates. And, the course of conduct between the parties shows that RBS consistently allowed Sherwood to do so until the global financial market collapsed in September 2008.  The primary issue in this adversary proceeding is whether RBS is liable to Sherwood for refusing to allow Sherwood to continue the "rolls."

### B.    Events of September 2008

Sherwood's claims arise out of events that occurred during a two-week period beginning September 15, 2008—the day after the collapse of Lehman Brothers. At that time, Sherwood held two sets of Certificates—the Rentech Certificates and the Dynamic Basket Certificates.[20]  The Dynamic Basket Certificates breached their stop-loss level on September 15, 2008.

Over the next few days, Benscher had several conversations with his normal trader at RBS, Michael Bayley, who was in New York on business, and Richard Langdon, the RBS agent covering Bayley's desk in London. On September 16, 2008, Benscher agreed to "roll everything over and we'll figure it out tomorrow."[21] Langdon asked Benscher to put

---

[20]    Freeman Decl. ¶ 30, Adv. Doc. No. 208-1; Freeman Dep. I at 231–34, Adv. Doc. No. 208-13; Freeman Dep. I Ex. 50, Adv. Doc. No. 208-15 at 116.
[21]    Adv. Doc. No. 223 Ex. 13.

Sherwood's directions into written instructions. Benscher complied and provided the written instructions in an instant messaging chat stating, "I agree to roll the lot."[22]

On September 17, 2008, Sherwood agreed to roll its Dynamic Basket investment into pre-existing Certificates with a lower stop-loss level of 59.5.[23] Sherwood acquiesced, at RBS's insistence, to roll into previously existing Certificates instead of waiting the five-day period for Euroclear to issue a new certificate number. During these negotiations, the Rentech Certificates also "knocked out."

Bayley prepared and sent Benscher the Term Sheet for the two rolls that now encompassed both the Dynamic Basket roll and the Rentech roll.[24] Benscher quickly gave his approval.[25] Bayley, under pressure to act fast due to the volatility in the market, promptly sent the Instructions to UBS.[26]

Sherwood then needed to make the required substantial Settlement Amounts: $957,637.80 to settle the Dynamic Basket roll, and $279,120 to settle the Rentech roll.[27] For the first time in the parties' business relationship, the Term Sheet required Sherwood to settle both trades on a T+1 basis—meaning settlement was due the next day on September 18, 2008.[28] RBS typically required settlement payments on T+2 or T+3—two or three days after execution of the trade, respectively.[29]

---

[22]   Adv. Doc. No. 233 Ex. 14.
[23]   Benscher Aff. ¶ 32–33, Adv. Doc. No. 224-1; Adv. Doc. No. 223 Ex. 15. The Settlement Payment was the difference between the "sell" price of the old Certificates and the "buy" price for the new Certificates. *See* September 17, 2008 Draft Instructions, Adv. Doc. No. 223 Ex. 16.
[24]   Adv. Doc. No. 223 Ex. 16.
[25]   September 17, 2008 Bloomberg Chat Transcript, Adv. Doc. No. 233 Ex. 17.
[26]   Bayley Dep. 143-145, Oct. 31, 2013, Adv. Doc. No. 208-22; Adv. Doc. No. 223 Ex. 18.
[27]   Adv. Doc. No. 223 Ex. 18.
[28]   *Id.*
[29]   Freeman Dep. I at 123, Oct. 5, 2013, Adv. Doc. No. 208-13.

Benscher overlooked the T+1 settlement term when he approved the two rolls.[30]

Benscher also failed to acknowledge that Sherwood did not have sufficient monies in its

unpledged UBS account to make the settlement payment the next day.[31] Benscher

needed the consent of Pentagon to use monies in their two pledged UBS accounts to

fund the rolls.[32] Benscher also needed to modify the Instructions given to UBS to reflect

that Sherwood would use its two pledged UBS accounts—not its unpledged account—to

settle the trade.[33]

On settlement day, September 18, 2008, Benscher contacted UBS and stopped

the money transfer.[34] He called Bayley ten separate times; they spoke at least once.[35]

During one of those calls, Benscher told Bayley that Sherwood could not pay for the two

rolls.  As Bayley puts it, he asked directly: "Can you pay for this?" to which Benscher

replied: "No."[36] After the phone call, Benscher and Bayley continued to talk.  Bayley

relayed that a UBS agent had informed RBS that Benscher "cancelled the roll."[37]

Benscher maintains Sherwood never actually "cancelled" the roll; Sherwood just could

not make the payment from its unpledged UBS account.[38] Throughout the day on

September 18, Benscher tried to get RBS to modify the Instructions to UBS, but RBS

refused.[39] RBS's position was clear: it would not engage in further discussions with

---

[30]   Benscher Aff. ¶ 33, Adv. Doc. No. 224-1.
[31]   Benscher Aff. ¶ 34, Adv. Doc. No. 224-1.
[32]   Benscher Aff. ¶ 34, Adv. Doc. No. 224-1.
[33]   Benscher Aff. ¶ 34, Adv. Doc. No. 224-1.
[34]   Benscher Aff. ¶ 35, Adv. Doc. No. 224-1; Iseppi Dep. 124–25, Nov. 8, 2012, Adv. Doc. No. 208-18.
[35]   Bayley Dep. 159–63, Adv. Doc. No. 208-22. The contents of these calls are the subject of a motion for spoliation sanctions filed by Sherwood. *See generally* Adv. Doc. No. 232.
[36]   Bayley Dep. 161–62 & 233–34, Adv. Doc. No. 208-22.
[37]   Adv. Doc. No. 223 Ex. 21.
[38]   Benscher Aff. ¶ 36, Doc. Adv. No. 224-1.
[39]   Benscher Aff. ¶¶ 35–37, Adv. Doc. No. 224-1. *See* Instant Bloomberg Chat on September 18, 2008, Adv. Doc. No. 223 Ex. 21.

Sherwood regarding any of its positions unless Sherwood paid the required settlement amount.[40] Benscher then sent a formal email to RBS pleading his case.[41] RBS did not respond.[42]

RBS agreed to separate the Rentech roll from the Dynamic Basket roll.  And, on September 19, 2008, Sherwood paid the $279,120 settlement to RBS.[43]

The parties, however, reached no resolution on the more costly roll of the Dynamic Basket Certificate. RBS insisted on payment of the $957,637.80 Settlement Amount before it would consider Sherwood's requested roll.[44] RBS notified Sherwood that its account was "suspended until funds have been received for trades that have been agreed."[45] Bayley further explained that if RBS was "going to have to make a claim against UBS for the [Dynamic Basket] role [sic] then the [account] has to be suspended."[46] Remember, UBS was technically RBS's client; thus, as Bayley alluded, any claim for nonpayment presumably would be lodged against UBS and not Sherwood. Benscher spoke with RBS's legal representatives that Friday, but could not reach a resolution. Benscher claims the lawyer never called him back, establishing a "failure to communicate."[47]

---

[40]   *See* Instant Bloomberg Chat on September 18, 2008, Adv. Doc. No. 223 Ex. 21. One Bloomberg message from Bayley to Benscher showed at least some willingness to extend the settlement date to the following day: "If we receive a mail from UBS confirming the rolls will settle tomorrow, I should be able to re-initiate things, yes." *Id.* No such settlement occurred however.

[41]   September 18, 2008 Email from Benscher to Bayley, Bayley Dep. Ex. 28, Adv. Doc. No. 208-23 at 86.

[42]   Benscher Aff. ¶ 37, Adv. Doc. No. 224-1.

[43]   Adv. Doc. No. 223 Ex. 24 at 3; Benscher Aff. ¶ 38, Adv. Doc. No. 224-1.

[44]   Adv. Doc. No. 223 Ex. 24.

[45]   Adv. Doc. No. 223 Ex. 24 at 2.

[46]   Adv. Doc. No. 223 Ex. 24 at 2.

[47]   Benscher claims Sherwood's legal representative said he would call back but failed to do so, further showing a pattern of noncommunication. One of Sherwood's breach of contract claims is premised on this failure to communicate.

On the following Monday, September 22, 2008, Benscher continued to contact RBS and kept asking whether the Dynamic Basket Certificates—the ones on which RBS was awaiting the  Settlement Amount—already had "knocked out."[48] RBS continued to demand payment.[49] At the end of the day, Bayley informed Benscher he needed to "step away from communications whilst [RBS's] claim is made against UBS, or until the trades are settled."[50] Bencher then hired a London attorney who arranged a conference call with RBS's legal representative, Adrian Mulryan, and a UBS representative on September 24, 2008.[51]

Mulryan stated that RBS regarded the situation as a disputed trade, reiterated that RBS would not consider rolling the Dynamic Basket Certificate until Sherwood paid the full Settlement Amount, and said they expected payment no later than September 25, 2008, or else RBS would do everything necessary to mitigate their risk.[52] Benscher again sought information on the current value of the new Dynamic Basket Certificates to determine whether they had already terminated. Sherwood claims Mulryan misrepresented that the Certificates had not "knocked out."

Sherwood finally paid the Settlement Amount of $957,637.80 for the Dynamic Basket Certificate roll on September 25, 2008.[53] Euroclear, the clearing agent, apparently had problems processing the payment.[54] Until the settlement cleared, Bayley told Benscher he still could take no orders from Sherwood.[55]

---

[48] *See* Instant Bloomberg Transcript of September 22, 2008, Adv. Doc. No. 223 Ex. 26 at 1.
[49] *Id.* at 1.
[50] *Id.* at 2.
[51] *See* Transcript of Conference Call on September 24, 2008, Adv. Doc. No. 223 Ex. 27.
[52] *Id.* at 7.
[53] Benscher Aff. ¶ 38, Adv. Doc. No. 224-1.
[54] Adv. Doc. No. 223 Ex. 30 at 2.
[55] *Id.*

The next day, September 26, 2008, while RBS still awaited confirmation that the Dynamic Basket roll settled, Bayley distributed an internal email within RBS that, when sent externally, was intended to notify Benscher that Sherwood's relationship with RBS was "being put under review."[56] Bayley was instructed to intentionally ignore Benscher until RBS received confirmation that the Dynamic Basket settlement went through.[57] RBS's attorney however informed Sherwood's lawyer that "trading will be seeking to carry out a review of the relationship following the recent incident."[58]

On September 29, 2008, RBS's counsel informed Sherwood's lawyer that the Dynamic Basket Certificates had "knocked out" and were terminated: "Your client failed to settle a trade—that trade has now settled. This is the end of the matter from our perspective. My understanding is that the product your client purchased, and failed to settle, has knocked out—i.e. been terminated."[59]

Unbeknownst to Sherwood, both the Dynamic Basket Certificates and the Rentech Certificates had "knocked out" the week before, on September 18 and September 16, respectively.[60] The Certificates were worthless before Sherwood paid to settle either trade. RBS put the entire practice of rolling Certificates with Sherwood under review and refused to roll any of Sherwood's other outstanding Certificates as they "knocked out" over the next few weeks. Six more sets of Certificates—separate and apart from the Dynamic Basket and Rentech Certificates—terminated between September 16 and September 18.[61] RBS did not notify Sherwood when these Certificates "knocked out" and

---

[56]   Adv. Doc. No. 223 Ex. 31.
[57]   Freeman Dep. I at 294–95, Oct. 5, 2013, Adv. Doc. No. 208.
[58]   Adv. Doc. No. 223 Ex. 35.
[59]   Adv. Doc. No. 223 Ex. 35.
[60]   Freeman Dep. I at 231–38, Adv. Doc. Nos. 208-13 & 208-14; Freeman Dep. I, Ex. 50, Adv. Doc. No. 208-15 at 116.
[61]   Adv. Doc. No. 223 Ex. 37; Freeman Dep. I at 313–20, Adv. Doc. No. 208-14.

did not give Sherwood the opportunity to roll these Certificates down to a lower stop-loss level. By October 8, 2008, all the Certificates Sherwood held7 with RBS had terminated. According to Sherwood, its Certificates went from having a value, on August 31, 2008, of $6,815,708 to zero.[62]

### C.    Sherwood's Claims Against RBS

Sherwood's Complaint raises thirteen counts against RBS. Counts I through IV assert RBS's breach of an alleged implied contract between the parties. Counts V through X assert various tort causes of action directed at RBS's conduct in September 2008. Counts XI through XIII focus on two transfers Sherwood made to RBS that Sherwood alleges are fraudulent, unjustly enriched RBS, or were converted by RBS. Sherwood's thirteen claims are all based on two broad arguments. First, Sherwood maintains that RBS was obligated to inform Sherwood when its Certificates "knocked out" and that RBS was obligated to allow Sherwood to roll its investments into new Certificates with a lower stop-loss level. Second, Sherwood claims that once the Dynamic Basket Certificates "knocked out," Sherwood no longer had to pay the Settlement Amount associated with the Certificate.

### D.    Procedural History

RBS filed a motion for summary judgment and two motions to exclude the opinions of Sherwood's expert witnesses.  In its motion for summary judgment, RBS contends that it is entitled to judgment as a matter of law on all thirteen of Sherwood's claims.  In its motions to exclude Sherwood's expert witnesses, RBS contends that Sherwood's experts

---

[62]  *See* Sherwood's August 31, 2008 UBS Account Statement, Adv. Doc. No. 223 Ex. 38; Benscher Aff. ¶ 41, Adv. Doc. No. 224-1.

utilized the wrong methodology in calculating Sherwood's alleged damages and that Sherwood's calculation of damages is otherwise too speculative to permit recovery.

On July 22, 2015, the Bankruptcy Court submitted for this Court's review a Proposed Memorandum Opinion granting summary judgment in favor of RBS on all of Sherwood's claims.  The Bankruptcy Court contemporaneously submitted for this Court's review two proposed orders granting RBS's motions to exclude Sherwood's experts.  The Bankruptcy Court thereafter established a briefing schedule for the parties to submit specific objections to the Bankruptcy Court's proposed orders.  The parties have submitted their respective objections and responses and this matter is now ripe for review.

## III.   LEGAL STANDARDS

When a bankruptcy court submits a proposed order to the district court, the district court conducts a de novo review of any matter to which a party has filed a timely and specific objection.  *See* 28 U.S.C. § 157(c)(1); Fed. R. Bankr. P. 9033(d).  De novo review "require[s] independent consideration of factual issues based on the record."  *Jeffrey S. v. State Bd. of Educ.*, 896 F.2d 507, 513 (11th Cir. 1990) (per curiam).  A party's failure to object to a particular portion of a bankruptcy court's proposed order waives the party's right to a de novo review as to that portion.  *Leonard v. Dorsey & Whitney LLP*, 553 F.3d 609, 619–20 (11th Cir. 2009).

On summary judgment, the moving party bears the burden of demonstrating the absence of any genuine factual dispute and that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Upon meeting this standard, the burden then shifts to the non-moving party to go beyond the pleadings and "identify affirmative evidence" which creates a genuine dispute of material

fact.  *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998).  The district court must read the evidence and draw all factual inferences therefrom in the light most favorable to the non-moving party and must resolve any reasonable doubts in the non-movant's favor.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

On the admissibility of expert evidence, the district court must examine the expert's opinion and determine whether: (1) the expert is qualified to offer the opinion, (2) the expert employed a reliable methodology in forming the opinion, and (3) the opinion will assist the trier of fact in deciding a disputed issue.  *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291–92 (11th Cir. 2005).  The party who offers an expert bears the burden of proving that the expert's opinion is admissible, and the party must do so by a preponderance of the evidence.  *Id.* at 1292.

## IV.    DISCUSSION

To begin, the Court notes that Sherwood does not object to the Bankruptcy Court's proposed entry of summary judgment in favor of RBS on Counts V, VI, IX, and XI of Sherwood's Complaint.  Accordingly, the Court will adopt the Bankruptcy Court's findings of fact and conclusions of law on those claims and grant summary judgment as proposed.  (*See* Proposed Mem. Op. 29–33 & nn.125–145, 42–44 & nn.188–195).  Further, while Sherwood objects to the Bankruptcy Court's proposed finding that its conversion claim in Count X is barred by the independent tort doctrine, Sherwood does not object to the Bankruptcy Court's alternative proposed finding that Sherwood cannot prove the legal elements of conversion.  The Court will therefore adopt the Bankruptcy Court's findings of fact and conclusions of law in this respect and grant summary judgment as proposed on Count X.  (*See* Proposed Mem. Op. 23–24 & nn.109–111).

Next, although Sherwood launches a number of objections against the Bankruptcy Court's proposed orders, this Court need only address two.  First, Sherwood objects to the Bankruptcy Court's proposed finding that it cannot prove damages on Counts I through IV, VII, and VIII.  Second, Sherwood objects to the Bankruptcy Court's proposed finding that 11 U.S.C. §§ 548 and 550 do not apply extraterritorially and, as a result, bars Sherwood from recovering on Counts XII and XIII. The Court addresses these objections in turn.

### A.   Whether Sherwood Can Prove Damages on Counts I Through IV, VII and VIII

In Counts I through IV, Sherwood alleges that its historical trading relationship with RBS established a pattern of conduct arising to an implied-in-fact contract, which RBS subsequently breached.  In Counts VII and VIII, Sherwood contends that RBS made intentional and negligent misrepresentations to Sherwood during the September 24, 2008 conference call between Benscher and Mulryan.  RBS moved for summary judgment on these counts for numerous reasons, the most pertinent of which for purposes of this Order being that Sherwood cannot prove the damages element for any of these claims.  The Bankruptcy Court agreed.  (*See* Proposed Mem. Op. 44–51 & nn.196–233).  To that end, the Bankruptcy Court struck Sherwood's expert evidence in part on the grounds that the experts employed the wrong methodology for estimating damages.  Sherwood objects, contending that its expert evidence is the proper evidence for proving its damages on Counts I through IV, VII, and VIII.

There should be no doubt that proof of damages is an essential element for proving the claims Sherwood alleges in Counts I through IV, VII, and VIII.  *See Specialty Marine & Industr. Supplies, Inc. v. Venus*, 66 So. 3d 306, 309, 310 (Fla. Dist. Ct. App. 2011)

(identifying damages as element for both intentional and negligent misrepresentation claims under Florida law); *Patten v. Winderman,* 965 So. 2d 1222, 1224 (Fla. Dist. Ct. App. 2007) (identifying damages as element for Florida breach of fiduciary duty claim); *Abbott Labs., Inc. v. Gen. Elec. Capital*, 765 So. 2d 737, 740 (Fla. Dist. Ct. App. 2000) (identifying damages as element for Florida breach of contract claim).

In its Complaint and throughout the proceedings, Sherwood has continuously asserted that the only damages it has suffered due to RBS's alleged misconduct is lost profits. Sherwood supported its claim to lost profit damages with the expert reports and testimony of Robert E. Conner, Richard J. Sussman, and Bruce S. Foerster. Mr. Conner and Mr. Sussman estimated that Sherwood lost between \$12 million and \$209 million in profits while Mr. Foerster approximated Sherwood's lost profits to be at least \$20.36 million.

However, as RBS correctly pointed out in its motion, and as the Bankruptcy correctly determined in its Proposed Memorandum Opinion, lost profits are not available in cases, such as this one, where the business was completely destroyed. "Only continuing businesses are entitled to recover lost profits attributable to a defendant's acts." *City of Key West v. Duck Tours Seafari, Inc.*, 972 So. 2d 901, 903 (Fla. Dist. Ct. App. 2007) (per curiam). Where the business at issue is completely destroyed—i.e., the business has ceased operations—"the proper total measure of damages is the market value of the business on the date of the loss, not lost profits." *Id.* (citation and internal quotation marks omitted); *see also Susan Fixel, Inc. v. Rosenthal & Rosenthal, Inc.*, 921 So. 2d 43, 45 (Fla. Dist. Ct. App. 2006) (finding that business was completely destroyed when it ceased operations).

The record evidence clearly demonstrates that Sherwood's business was completely destroyed by October 2008.  Sherwood's last Certificates "knocked out" on October 8, 2008 and Sherwood never made another purchase or trade after.[63] Sherwood's only unpledged bank account with UBS carried a negative closing balance as of October 31, 2008 and, as a result, UBS liquidated all of Sherwood's remaining investments.[64]  Sherwood never used any of its other UBS bank accounts again after October 2008.[65]  Even Sherwood's own experts determined that Sherwood ceased all operations in October 2008.[66]

The only arguments Sherwood offered to rebut RBS's showing that Sherwood was completely destroyed as of October 2008 was that it continued to operate a small farming subsidiary and that Sherwood hoped to restart its investment business after bankruptcy. As to the farming subsidiary, however, the record shows that the extent of Sherwood's involvement was that it acted as a guarantee on a singular farming loan.[67]  The Court finds this de minimis activity wholly insufficient as a matter of law to demonstrate the existence of an ongoing business, especially considering that Sherwood's business was in finance, not agriculture.  And, as the Bankruptcy Court observed, Sherwood's hopes and dreams for the future are not enough to survive summary judgment.

Ironically, the three cases Sherwood cites in its objection to support the proposition that it was a continuing business beyond October 2008 only bolster the Court's conclusion that it was not.  In *Katz Deli of Aventura, Inc. v. Waterways Plaza, LLC*, 183 So. 3d 374

---

[63]   Adv. Doc. No. 223, ¶ 42 & Ex. 37.
[64]   Adv. Doc. No. 208-44, pp. 29–37 & Ex. H; Adv. Doc. 224, ¶ 44.
[65]   Adv. Doc. No. 208-44.
[66]   Adv. Doc. No. 208-37, 317:3–24; Adv. Doc. 208-39, 128:4–14.
[67]   Adv. Doc. No. 224, ¶ 43.

(Fla. Dist. Ct. App. 2013), a deli suffered a substantial decrease in business over a period of several months due the landlord's failure to fix a leaking roof, eventually forcing the deli to close. *Id.* at 378. Commenting that the case presented "a unique set of facts," the *Katz Deli* court found that, although the business was not completely destroyed when the leaks started because the deli continued to operate, the end result was a complete destruction of the business because the deli closed and never re-opened. *Id.* at 380–81. The *Katz Deli* court therefore concluded that equitable principles demanded that the deli recover its lost profits as opposed to lost market value, as lost market value provided an inadequate remedy under the particular circumstance to compensate the deli for its landlord's failings. *Id.* at 381. In *Sostchin v. Doll Enterprises, Inc.*, 847 So. 2d 1123 (Fla. Dist. Ct. App. 2003), the court determined that a shoe business was not completely destroyed after a fire because the business relocated to a new building six weeks later, where it continued to sell shoes for years. *Id.* at 1125. The court in *Zinn v. GJPS Lukas, Inc.*, 695 So. 2d 499 (Fla. Dist. Ct. App. 1997), also found that a business was not completely destroyed where the owner continued to grow and sell brine shrimp for a profit. *Id.* at 500.

The facts of this case are completely inapposite to those in *Katz Deli*, *Sostchin*, and *Zinn*. Unlike the businesses in *Sostchin* and *Zinn*, Sherwood essentially closed up shop for all purposes as soon as its last Certificates "knocked out" on October 8, 2008. And in contrast to the "unique circumstances" of *Katz Deli*, Sherwood fails to show that its market value as of October 8, 2008 would not be an adequate remedy. Accordingly, the only measure of damages Sherwood can pursue is its market value at the time it was completely destroyed.

Because Mr. Conner, Mr. Sussman, and Mr. Foerster all opine on Sherwood's lost profits, they employed the wrong methodology for calculating Sherwood's damages and would therefore be unhelpful to the trier of fact; as a result, their opinions must be stricken. Likewise, since there is no evidence in the record speaking to Sherwood's market value at the time it was completely destroyed, Sherwood cannot prove the damages element of Counts I through IV, VII, and VIII. RBS is consequently entitled to summary judgment on those claims. For these reasons, Sherwood's objections to the Bankruptcy Court's proposed findings are overruled and summary judgment will be entered in favor of RBS.[68]

## B.     Whether 11 U.S.C. §§ 548 and 550 Apply Extraterritorially

In Counts XII and XIII, Sherwood seeks to recover two settlement payments totaling almost $1.3 million it made to RBS for the Rentech Roll ($279,120) and the Dynamic Basket Roll ($957,637.80) as fraudulent transfers under §§ 548 and 550 of the Bankruptcy Code. Sherwood argues that these transfers were constructively fraudulent because the underlying Certificates had already "knocked out" when Sherwood tendered the payments to RBS. Sherwood concludes that it did not receive equivalent value and that the transfers should be avoided.

In its motion for summary judgment, RBS argued that the presumption against extraterritorial application of federal statutes bars Sherwood's claims under §§ 548 and 550, as the conduct giving rise to the allegedly fraudulent transfers occurred abroad. The Bankruptcy Court again agreed. (*See* Proposed Mem. Op. 33–42 & nn.146–187). Sherwood objects on the ground that the Bankruptcy Court misapplied the presumption

---

[68] Because this issue fully resolves Counts I through IV, VII, and VIII, Sherwood's remaining objections on these claims are overruled as moot.

against extraterritorial application of a federal statute to conduct outside the United States.

The presumption against a federal statute's extraterritorial reach is well-settled:

> It is a longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States. This principle represents a canon of construction, or a presumption about a statute's meaning, rather than a limit upon Congress's power to legislate. It rests on the perception that Congress ordinarily legislates with respect to domestic, not foreign matters. Thus, unless there is the affirmative intention of the Congress clearly expressed to give a statute extraterritorial effect, we must presume it is primarily concerned with domestic conditions.

*Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010) (citations and internal quotation marks omitted).  To rebut the presumption against extraterritorial application, the statute must "evince a 'clear indication of extraterritoriality.'"  *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1665 (2013) (quoting *Morrison*, 561 U.S. at 265).  In short, "[w]hen a statute gives no clear indication of an extraterritorial application, it has none."  *Id.*

Neither the Supreme Court nor the Eleventh Circuit have addressed the presumption against extraterritorial application of the Bankruptcy Code's fraudulent transfer provisions, and other courts disagree on the issue.  *Compare In re French*, 440 F.3d 145, 150–52 (4th Cir. 2006) (affirming the avoidance of a constructively fraudulent transfer of real property located in the Bahamas), *with Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec LLC*, 513 B.R. 222, 228–29 (S.D.N.Y. 2014) (refusing to apply fraudulent transfer provisions to foreign transfers).  Nevertheless, the Supreme Court's holdings in *Morrison* and *Kiobel* provide enough guidance to lead this Court to the conclusion that §§ 548 and 550 do not apply extraterritorially.

To begin, nothing in the statutory language or legislative history of §§ 548 or 550 indicate that Congress intended these provisions to apply to conduct outside the United States.  *See Sec. Inv'r Prot. Corp.*, 513 B.R. at 228 (observing the same); *In re Bankr. Estate of Midland Euro Exch. Inc.*, 347 B.R. 708, 717 (C.D. Cal. 2006) (observing the same).  Absent an affirmative representation from Congress that it intended these statutes to apply extraterritorially, the Court must therefore presume against extraterritorial application.  To that end, Sherwood fails to produce any argument or evidence to overcome this presumption.  Indeed, the Bankruptcy Court explained in detail that Sherwood's dealings with RBS had, at most, a tangential connection with the United States.  (*See* Proposed Mem. Op. 38–39 & nn.173–176).  The Court agrees with those findings and concludes that the conduct at issue in this case is insufficient to overcome the presumption against extraterritorial application.

Sherwood attempts to sidestep the absence of a clear congressional intent to apply §§ 548 and 550 to conduct occurring outside the United States by pointing to § 541 of the Bankruptcy Code, which describes what property is included within the bankruptcy estate. Sherwood reasons that, since § 541 defines property of the estate as essentially all property in which the debtor holds an interest "wherever located," *see* 11 U.S.C. § 541(a), Congress must have intended to apply the Bankruptcy Code—at least with respect to property of the estate—beyond the territorial boundaries of the United States.  As a result, Sherwood concludes that, since the funds it transferred to RBS are property of the estate, the Bankruptcy Code's fraudulent transfer provisions must necessarily apply extraterritorially to recover those funds.

While a reasonable interpretation on its own, Sherwood ignores the remainder of § 541's text—notably, a subsection which limits property of the estate to property *recovered* as a fraudulent transfer.   *See* 11 U.S.C. § 541(a)(3).   In other words, Sherwood's argument could only hold if the allegedly fraudulent transfers had already been avoided and the funds already recovered.   There is no dispute however, nor could there be, that this is not the case here, since Sherwood is currently attempting to recover these funds.[69]   Consequently, the funds are not property of the estate according to § 541, rendering Sherwood's argument in favor of extraterritorial application inapplicable.

Sherwood's objection concerning the Bankruptcy Court's proposed finding that 11 U.S.C. §§ 548 and 550 cannot be applied extraterritorially is overruled and summary judgment will be granted in favor of RBS on Counts XII and XIII.

## V.     CONCLUSION

For the aforementioned reasons, it is **ORDERED AND ADJUDGED** as follows:

1. Plaintiff's Objections to Proposed Memorandum Opinion and Related Orders (Doc. 23) are **OVERRULED** and **OVERRULED AS MOOT** as stated herein.

2. The Bankruptcy Court's Proposed Memorandum Opinion Granting Defendant's Motion for Summary Judgment (Doc. 20-1) is **ADOPTED AND CONFIRMED IN PART** as stated herein.  The Bankruptcy Court's Proposed

---

[69]   Sherwood attempts to avoid this fact further by arguing that its interest in the funds arises under state law and that, according to Florida law, legal title to property procured by fraud never passes to the transferee.  While it is true that state law controls the creation of property interests, federal law controls whether a property interest is included within the bankruptcy estate.  *In re Witko*, 374 F.3d 1040, 1043 (11th Cir. 2004).  As a result, the only relevant inquiry is whether the property at issue has been *recovered.  See* 11 U.S.C. § 541(a)(3).  Since the funds have not been recovered in this case, they are not property of the estate as contemplated by the Bankruptcy Code.  *See Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec LLC*, 513 B.R. 222, 229–30 (S.D.N.Y. 2014).

Memorandum Opinion (Doc. 20-1) is made a part of this Order to the extent it is adopted.

3.  The Bankruptcy Court's Proposed Order Excluding Expert Testimony of Plaintiff's Expert Bruce S. Foerster (Doc. 20-3) is **ADOPTED AND CONFIRMED** and is made a part of this Order.

4.  The Bankruptcy Court's Proposed Order Excluding Expert Testimony of Plaintiff's Experts Conner and Sussman (Thornapple) (Doc. 20-4) is **ADOPTED AND CONFIRMED** and is made a part of this Order.

5.  Defendant's Dispositive Motion for Summary Judgment (Doc. 2) is **GRANTED**.  The Court will enter final judgment as a separate document.

6.  Defendant's Motion to Exclude Expert Opinions of Bruce S. Foerster (Doc. 11) is **GRANTED**.

7.  Defendant's Motion to Exclude Expert Opinions of Conner & Sussman (Doc. 12) is **GRANTED**.

8.  The Clerk of Court is **DIRECTED** to close the file following the Court's entry of Final Judgment.

**DONE AND ORDERED** in Orlando, Florida on September 30, 2016.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

The Presiding Bankruptcy Judge
Counsel of Record